United States Court of Appeals
Fifth Circuit

**F I L E D**

June 11, 2003

Charles R. Fulbruge III
Clerk

**REVISED JUNE 13, 2003**

**UNITED STATES COURT OF APPEALS**

**For the Fifth Circuit**

———————————

No. 02-30246

———————————

JOHN MUSMECI; CARROL BOUDREAUX; WILLIE BLANCHARD; MELVIN CAMET, SR.; JOSEPH DECUIR; MAURICE MIRANDA; JACQUELINE S. PALAMA; VICTOR SCHAMBRA; BRUCE SOLOMONS; JOSEPH T. SPITELERA; AUDREY TOAL; on their own behalf and on behalf of all similarly situated employees; YVONNE WHITE; CYNTHIA NORMAND; CHARLES CARROL DIONNE; JOSEPH O'NEIL DIONNE,

Plaintiffs-Appellees,

VERSUS

SCHWEGMANN GIANT SUPER MARKETS, INC.; SCHWEGMANN GIANT SUPER MARKETS PENSION PLAN; JOHN F. SCHWEGMANN; G.G. SCHWEGMANN CO.; JOHN SCHWEGMANN, JR. TRUST ESTATE; UNITED STATES FIDELITY & GUARANTY COMPANY,

Defendants-Appellants,

———————————

Appeal from the United States District Court
For the Eastern District of Louisiana

———————————

Before KING, Chief Judge, DAVIS, Circuit Judge and LITTLE, District Judge.[*]

W. EUGENE DAVIS, Circuit Judge:

Defendants, Schwegmann Giant Super Markets, Inc. (SGSM, Inc.), Schwegmann Giant Super

———————————

[*] District Judge of the Western District of Louisiana, sitting by designation

-1-

Markets Pension Plan (SGSM Pension Plan), John F. Schwegmann, Jr. (Mr. Schwegmann), G.G. Schwegmann Co. (G.G. Schwegmann), John Schwegmann, Jr. Trust Estate (Schwegmann Trust) (collectively the "Schwegmann Defendants"), and United States Fidelity & Guaranty Company (USF&G) (collectively the "Defendants"), appeal the district court's adverse money judgment, in favor of the Plaintiff class, holding, *inter alia,* that a grocery voucher plan established by Schwegmann Giant Super Market Partnership (SGSM) was a pension benefit plan under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001-1461, that the Plaintiffs were entitled to monetary relief, and that a self insured retention (SIR) in a USF&G policy covering SGSM's liability for employee benefits incidents could be applied once to Plaintiffs' claims collectively. We agree with the district court except with respect to defendant USF&G. We conclude that the SIR in USF&G's policy applies to each class member's claim. Because no individual claim exceeds the SIR, we vacate the judgment against USF&G.

I.

Until 1997, SGSM operated a chain of over forty grocery stores, employing over 5000 employees, primarily in the New Orleans, Louisiana area. SGSM is a partnership comprised of SGSM, Inc., G.G. Schwegmann, and Schwegmann Trust. SGSM, Inc. owned a seventy percent interest in the partnership and was its managing partner. Mr. Schwegmann was the majority stockholder of SGSM, Inc. and its chief executive officer. As such, Mr. Schwegmann was responsible for the daily operations of SGSM and was the primary policy maker for the partnership.

Mr. Schwegmann conceived a plan for SGSM to give its retirees groceries and other goods free of charge. Mr. Schwegmann then worked with Mr. Sam Levy, president of SGSM, Inc., and Mr. Joe Warnke, SGSM director of human resources, to create a voucher program for long-term SGSM

-2-

employees at their retirement. In 1985, SGSM implemented this grocery voucher plan (the "Voucher Plan") designed to supply SGSM retirees with a portion of their monthly food needs. Under this plan, SGSM issued vouchers to retirees, and these vouchers could then be used in lieu of cash to purchase goods in SGSM stores. It is this Voucher Plan which is the subject of this lawsuit.[1]

In 1985, Joe Warnke prepared a memorandum memorializing the eligibility requirements for participation in the Voucher Plan.[2] To qualify for the vouchers, an employee must have completed twenty years of service with SGSM, have reached t he age of sixty, and have been employed in a supervisory position for at least one year at the time of retirement. SGSM informed qualifying employees of the program at the time of their retirement. Each month, SGSM sent qualifying employees a set of four vouchers worth a total of $216. These vouchers were valid for a period of

---

[1] Joseph T. Spitelera, a non-class plaintiff, retired in 1980. Rather than receiving vouchers, Mr. Spitelera received $305 dollars per month from SGSM. Many of the arguments regarding whether the Voucher Plan was an ERISA plan do not apply to Mr. Spitelera's individual claims.

[2] The memorandum reads in part:

To:      Mr. John F. Schwegmann
From:   Joe Warnke
Subject:       Retirement/Compensation

I have prepared notes of our conversation of July 2, 1985 in order to preserve our memory and serve as a reminder to complete this project.

REQUIREMENTS:

* Must have completed twenty (20) years of service.
* Must have achieved the age of sixty (60).
* Must have been employed in a position of supervisor or a position of greater responsibility for at least one year at the time of retirement.

-3-

thirty days, redeemable only at SGSM stores and could not be transferred. Although SGSM intended the vouchers to be used only for in-kind purchases with no cash redemption, store personnel, including managers, were largely unaware of this proscription, and retirees were often given change in cash when using the vouchers for grocery purchases.

SGSM had no written procedures for administering the Voucher Plan. The Voucher Plan was nonetheless run in a systematic manner. When a manager or supervisor retired, the SGSM human resources department prepared a form with information used to determine whether the employee qualified for the Voucher Plan. The form was then sent to Sam Levy who reviewed the form and decided whether a retiree qualified for the program. Levy would sign the forms of qualified retirees and forward the forms to the SGSM controller, Gene Lemoine, who issued the vouchers. Lemoine performed this task two to three days before the month in which they were to be used. Once used, the vouchers were routed back to Lemoine who retained them for five years.

SGSM did not set up a trust to fund the Voucher Plan. Rather, the Voucher Plan was funded out of the partnership's general revenue. Each year, SGSM deducted the total face value of the vouchers as a business expense on its tax returns under the category of "retirement plans, etc." SGSM also issued an Internal Revenue Service form 1099-R to every retiree receiving vouchers, reflecting the face value of the vouchers received by the retiree that year.

By the early 1990's, SGSM experienced declining profits due to competition from well-financed national supermarket chains. In 1995, Mr. Schwegmann decided to aggressively expand SGSM to compete with these stores. SGSM acquired the 28-store National Tea Company chain and, in doing so, undertook a sizable debt. After this acquisition, SGSM continued to suffer from financial losses, and in 1997, it sold the business. A week before the sale, Mr. Schwegmann sent a letter to all

voucher recipients informing them that they would no longer receive vouchers because of the sale of the business. Because Mr. Schwegmann considered the Voucher Plan a gratuity subject to termination at will, he made no provision for the continuation of the Voucher Plan after the sale.

When Mr. Schwegmann sent the letter to the retirees, SGSM was insured under a USF&G excess general liability policy with a self-insured retention (SIR) of $1 million per claim and a premium of $200,000. The policy included Excess Employee Benefits Liability coverage. This policy was not due to expire until July 1997; however, because of the impending sale, the policy was cancelled. In its place, a similar policy was issued to cover SGSM's remaining liability while it was winding up its business. This policy had a lower premium of $25,000 and a lower SIR of $250,000 for each claim. Both policies were "claims made" policies rather than "occurrence" policies.

After being informed of the termination of the Voucher Plan, Plaintiffs filed this suit on behalf of themselves and other similarly situated individuals under ERISA and Louisiana state law claiming that they were vested in a pension benefit plan. Plaintiffs are former employees of SGSM who were adversely affected by the termination of the grocery Voucher Plan when SGSM sold its business in February 1997. The matter was certified as a class action, defining the plaintiff class as:

> Those individuals who were SGSM employees and (1) who were retired and receiving grocery vouchers when SGSM stopped the program, or (2) who, although not retired or receiving grocery vouchers at the time SGSM stopped the grocery program, were (i) supervisors for at least one year before retirement, and (ii) had at least 20 years experience with SGSM.

After a bench trial, the court dismissed the Plaintiffs' state law claims. After taking the remaining claims under advisement, the court issued findings of fact and conclusions of law, ruling that the grocery Voucher Plan was a pension benefit plan under ERISA, that SGSM breached its fiduciary duty under ERISA, that Mr. Schwegmann was liable as a fiduciary to the plan, that the Plaintiffs were

entitled to monetary relief for benefits denied after SGSM's sale, that USF&G's policy covered SGSM's liability, and that the policy's SIR applies once to the Plaintiffs' claims collectively. However, the court requested additional briefing on the issue of class membership. Based on the stipulations of the parties and the evidence presented at the hearing, the district court determined that all but seven individuals filing a notice of claim qualified for class membership. Thereafter, the district court issued a final judgment consistent with its findings.

The Defendants lodged a timely appeal, urging various grounds for reversal. We address each of the Defendants' arguments in turn.

## II.

While not disputing the underlying facts, USF&G first argues that the district court committed legal error in concluding that the in-kind Voucher Plan constituted a pension benefit plan under ERISA. The Schwegmann Defendants have adopted USF&G's argument by reference. Specifically, the Defendants contend that ERISA does not apply to any program providing a non-cash benefit. This court reviews legal challenges *de novo.* Brittan Communications Intern. Corp. v. Southwestern Bell Telephone Co., 313 F.3d 899, 906 (5th Cir. 2002).

ERISA does not regulate all benefits paid by an employer, but only those paid pursuant to an "employee benefit plan." Fort Halifax Packing v. Coyne, 482 U.S. 1, 11, 107 S.Ct. 2211, 2217 (1987); 29 U.S.C. § 1003. Two different types of benefit programs are regulated by ERISA: welfare plans and pension plans. 29 U.S.C. § 1002. The district court determined that the Voucher Plan was a pension benefit plan and not a welfare benefit plan. The Plaintiffs have not challenged this ruling. The Defendants, however, challenge the district court's determination that it is a pension benefit plan.

To determine whether ERISA applies to the Voucher Plan, we begin our analysis with an

-6-

examination of the language of the statute itself. ERISA defines an "employee pension benefit" plan as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program . . . provides retirement income to employees. . . 29 U.S.C. § 1002 (2) (A) (i).

The parties agree that SGSM established a "program." Thus, the primary issue this court must resolve is whether the vouchers issued pursuant to SGSM's Voucher Plan provided the Plaintiffs with "retirement income."

Neither ERISA's statutory provisions nor the federal regulations define the term "income." However, they do not affirmatively require that the pension benefit be paid in cash. Moreover, the Department of Labor (DOL) refused to declare as a general policy whether in-kind benefits are regulated by ERISA. See ERISA Advisory Op. (March 26, 1999), 1999 ERISA LEXIS 11. We have likewise found no controlling case law directly addressing the issue.

Relying on the definition of "income" used for the purposes of determining taxable income under the Internal Revenue Code (IRC), 26 U.S.C. §1, *et seq.*, the district court found that the grocery vouchers constituted retirement income. We believe that the district court's analysis is sound given the close connection between ERISA and the IRC.

Congress dedicated Title II of ERISA entitled "Amendments to the Internal Revenue Code Relating to Retirement Plan," (Title II), to addressing taxation of retirement plans. Pub. L. 93-406, 88 Stat. 829, Sec. 1001, *et. seq*. Title II amends provisions of the IRC and sets forth guidelines and standards governing the establishment and operation of pension plans qualified for favorable tax treatment. Pub. L. 93-406, 88 Stat. 829, Sec. 1001, *et. seq*.; Cafee, Halter & Griswold, et al. v.

-7-

<u>Commissioner of Internal Revenue</u>, 88 T.C. 641, 650 (1987). Title I sets out guidelines and standards governing the establishment and operation of pension plans. Title I, which defines "employee benefit plan," was drafted in concert with Title II. Pub. L. 93-406, 88 Stat. 829, et. seq; <u>Cafee, Halter & Griswold, et al. v. Commissioner of Internal Revenue</u>, 88 T.C. 641, 651. Much of Title I of ERISA was duplicated in Title II, indicating that overlapping terms should be consistently defined in both. <u>Esden v. Bank of Boston</u>, 229 F.3d 154, 158 (2nd Cir. 2000); See e.g. 26 U.S.C. § 411(a)(7) and 29 U.S.C. § 1002(23) (same definition of "accrued benefit"); 26 U.S.C. § 411 (a) (8) and 29 U.S.C. § 1002 (24) (same definition of "normal retirement age"); 26 U.S.C. § 411 (a)(9) and 29 U.S.C. § 1002 (22) (same definition of "normal retirement benefit").

We acknowledge that courts generally do not look to other statutes to determine the meaning of a term where an act has left that term undefined. See e.g. <u>Lukhard v. Reed</u>, 481 U.S. 368, 107 S.Ct. 1807 (1987) (relying on the general meaning of "income" for the purposes of determining whether personal injury awards were included as income under the Aid to Families with Dependant Children program). In such instances, courts rely on common usage to give the term meaning. However, in this instance, we believe that the interconnection between ERISA and the IRC reflects an intent to use common terminology.

This court has interpreted the term income broadly under the IRC to include anything that can be valued in terms of currency. <u>United States v. Parr</u>, 509 F.2d 1381, 1385 (5th Cir. 1975) (citing <u>Commissioner v. John Smith</u>, 324 U.S. 177, 65 S.Ct. 591 (1945)). The district court was entitled to infer that when SGSM deducted the vouchers' face value as a business expense on its tax returns under the category of "retirement plans" and issued Internal Revenue Service form 1099-R's to the recipients of the vouchers, SGSM considered the vouchers as income under the IRC. The cash value

of the grocery vouchers is readily ascertainable from the face of the vouchers. The district court correctly concluded that the vouchers constitute income and the Voucher Plan is governed by ERISA.

Even if we were to adopt the plain or ordinary meaning of "income," our conclusion would be the same. As noted by the Supreme Court in Lukhard v. Reed, the term "income" is commonly understood to mean a "gain or recurrent benefit usually measured in money." Lukhard v. Reed, 481 U.S. 368, 374 (citing Webster's Third International Dictionary 1143(1976)). Because the vouchers provided a gain or benefit to SGSM employees and could readily be measured in money, they would constitute income as the term is generally understood.

We are not persuaded that any of the authorities cited by the Defendants would dictate a contrary result. The Defendants contend that the Voucher Plan is not an employee pension plan because it constitutes a "sale to an employee" which is excluded from the scope of ERISA under DOL regulations. The regulation to which the Defendants refer provides:

> (e) Sales to employees. For purposes of Title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include the sale by an employer to employees of an employer, whether or not at prevailing market prices, of articles or commodities of the kind which the employer offers for sale in the regular course of business. 29 C.F.R. § 2510.3-1 (e).

As the Defendants point out, the regulation does not impose any limitation on the price at which the merchandise is sold, whether at prevailing market price or at a deeply discounted price. However, we agree with the district court that SGSM's transfer of vouchers to its employees bear none of the hallmarks of a sale.[3] SGSM received no money or anything else of value in exchange for

_____

[3] sale, *n*. **1.** The transfer of property or title for a price. **2.** The agreement by which such a transfer takes place. * The four elements are (1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised. Black's Law

the vouchers or for the groceries. The parties never intended for the retiree to pay for the vouchers. The transactions are much closer to gifts by SGSM. This comports with the gratuitous intent expressed by Mr. Schwegmann in his testimony. As noted by the district court the Voucher Plan "did not just offer goods for sale to its employees -- it provided them with a means to pay for them." Musmeci v. Schwegmann Giant Super Markets, 159 F.Supp.2d 329, 345 (E.D. La. 2001). The district court equated this to conferring "cash spending power," distinguishable from a program that simply allowed retirees to use their own funds to purchase groceries from SGSM stores. Id. We agree with the district court that these transactions were not sales by an employer to an employee. Thus, we find Defendant's argument on this point unpersuasive.

The Defendants next argue that the case law dictates that no in-kind benefit can ever be covered by ERISA. The cases relied on by the Defendants are district court cases, several of which are unpublished, involving airline programs allowing their employees and retirees to fly free or at reduced rates.[4] See Constantine v. American Airlines Pension Benefit Plan, 162 F.Supp.2d 552 (N.D. Tex. 2001); Pruec v. Continental Micronesia, Inc., No. 96-00017, 1997 WL 538933 (Dist. Guam Aug., 29, 1997); Prince v. American Airlines, Inc., No. 97- 7231, 1999 WL 696178 (S.D. N.Y. Oct. 6, 1999); Eaton v. Delta Airlines, Inc., No. 87-748, 1988 U.S. Dist. LEXIS 15986 (W.D. Wash. May

---

Dictionary (7th Ed. 1999).

[4] The only case outside of this context is Jervis v. Elderling, 504 F. Supp. 606 (C.D. Cal. 1980). In Jervis, the court addressed whether an agreement in which the employer agreed to provide rent-free housing to the employee upon termination or retirement provided for a ERISA pension plan. The court held it did not, relying largely on the fact that the agreement to provide housing was made pursuant to a formal employment contract negotiated by an employer and an individual employee. The fact that the agreement provided for in-kind compensation was not discussed by the court in reaching its conclusion. Thus, the case does not stand for the position espoused by the Defendants.

25, 1988). Significantly, these cases involve travel benefits in what would otherwise be an empty seat.

Treating the issue in a summary fashion, each court concluded with little or no analysis that travel benefits were not ERISA pension benefit plans because they did not provide "income" to the retiree. Had the courts looked to the IRC to determine whether the travel benefits were income, they would have answered this question in the negative because these benefits provided a "no-additional-cost-service." See 26 U.S.C. § 132 (a)(1).

Finally, the Defendants relying on Pruec v. Continental Micronesia, Inc., *supra,* argue that in-kind programs are not the sort of plans with which ERISA is concerned. The district court in Pruec concluded that unfunded, in-kind programs permitting employees a free standby seat on the employer's airplane paid out of the general assets of the employer are generally not ERISA benefit plans.

The Pruec court relied in part on the general purpose behind ERISA as expressed by the United States Supreme Court in California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc., 519 U.S. 316, 117 S.Ct. 832 (1997). The Dillingham Court noted that the primary purpose of ERISA was to prevent the mismanagement of "funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds." Id. at 326-327. (citing Massachusetts v. Morash, 490 U.S. 107, 115, 109 S.Ct. 1668, 1673 (1989)). The Dillingham Court concluded that it is only when money is included in a special fund to finance the benefit that ERISA's coverage is triggered. Id. at 326. However, the facts and legal issues presented in Dillingham bear no resemblance to this case.

Dillingham is a preemption case. The Court examined whether a California wage statute (California Statute) was preempted by ERISA. The California Statute allowed contractors to pay a

lower apprentice wage, (rather than a higher journeyman wage), only if the apprentice was trained in an approved apprenticeship program as defined by the California statute. Under ERISA, certain apprenticeship programs as defined by ERISA are considered welfare benefit plans. 29 U.S.C. § 1002 (1). The qualifying apprenticeship programs, however, are defined differently by the federal and state statutes. The Court declined to hold that the California Statute was preempted by ERISA because California had different standards than ERISA for apprenticeship programs. Specifically, the Court held that an apprenticeship program maintained by a single employer under the California Statute and paid through the employer's general assets was not an ERISA plan. Rather, the "benefits" of these programs are part of the employee's wages. The Court observed that the risk involved in failing to fund an apprentice wage program is "indistinguishable from 'the danger of defeated expectations of wages for services performed,' a hazard with which ERISA in unconcerned." Id. at 327. (Citing Massachusetts v. Morash, 490 U.S. 107, 115).

We are satisfied the Pruec court read Dillingham much too broadly. The Supreme Court was concerned with distinguishing programs where employers fund ERISA plans from programs where employers provide funds to pay wages. The Court did not purport to impose a general limitation on the application of ERISA to plans in which the employer had accumulated funds.

Our interpretation of Dillingham is consistent with Massachusetts v. Morash which, likewise, addressed an issue related to the payment of wages. Like Dillingham, Massachusetts v. Morash is a preemption case. The case involved a Massachusetts statute requiring employers to pay discharged employees their wages in full on the day of their discharge. Massachusetts v. Morash, 490 U.S. 107, 110. The Massachusetts statute defined wages to include holiday or vacation pay. Id. Under ERISA, certain programs providing vacation benefits are welfare benefit plans. 29 U.S.C. § 1002 (1).

-12-

However, the Court declined to hold that the Massachusetts statute requiring the employer to pay for unused vacation time constituted an ERISA welfare benefit plan. Massachusetts v. Morash, 490 U.S. 107, 114.

The Court found that, when a single employer paid an employee vacation pay out of the company's general assets, this practice was similar to other "payroll practices" outside of the scope of ERISA. Id. at 118. (Citing 29 C.F.R. § 2510.3-1 (b) (providing that overtime, shift premiums, holiday premiums and weekend premiums paid as compensation for work performed are not welfare benefit plans under ERISA)). "[E]xcept for the fact that the payment has been deferred, such payments are as much a part of the employees' regular basic compensation as overtime pay or the payment of salary while the employee is absent on vacation." Id. at 120. "States have traditionally regulated the payment of wages, including vacation pay." Id. at 119. The Court reasoned that the fact that payments for unused vacation were due at termination did not affect their character as regular compensation. Id. at 120.

Because the SGSM Voucher Plan, designed to benefit *retired* employees, is unrelated to the payment of wages, Dillingham and Massachusetts v. Morash are inapplicable. Accordingly, the Defendants' arguments that a plan to pay benefits from current earnings cannot constitute an ERISA plan is not supported by the holdings or reasoning of these cases.

III.

USF&G next argues that even if the Voucher Plan is governed by ERISA, the plaintiffs are not entitled to relief. The Schwegmann Defendants have again adopted USF&G's argument by reference.

Specifically, the Defendants contend that, because Section 502 (a)(1)(B) allows only the

recovery of "plan benefits," plaintiffs may recover only grocery vouchers (which are now worthless) under ERISA and not their cash equivalent. 29 U.S.C. § 1132 (a) (1) (B).

Section 502 (a)(1)(B) reads:

(a) Persons empowered to bring a civil action. A civil action may be brought–

(1) by a participant or beneficiary–

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

While we have found no case law considering the measure of damages where a plaintiff has been denied an in-kind benefit under a pension plan, Section 502 (a)(1)(B) also applies to welfare benefit plans. Welfare benefit plans offering healthcare benefits typically provide for medical treatment, an in-kind benefit. Participants are clearly entitled to the value of health care benefits when the participant personally pays for treatment which has been wrongfully denied. See Roark v. Humana Inc., 307 F.3d 298, 309 (5th Cir. 2002); Dowden v. Blue Cross & Blue Shield, Inc., 126 F.3d 641 (5th Cir. 1997) (*per curiam*). To hold otherwise would put a participant in a medical benefit plan in the untenable position of either (1) foregoing potentially life-saving medical treatment until the right to the treatment is conclusively litigated or (2) personally paying for the treatment without the right to recover its cost.

Citing case law rejecting recovery of tort and punitive damages under ERISA, the Defendants argue that the district court's award of monetary damages is a prohibited "extracontractual" remedy. See e.g. Corcoran v. United Health Care, Inc., 965 F.2d 1321 (5th Cir. 1992) (rejecting a claim for emotional distress under ERISA). These cases are not helpful to Defendants because they do not address whether in-kind plan benefits – which have been denied – can be measured in terms of a

monetary award. We see no good reason why the district court was prohibited from making a monetary award. The classic measure of contract damages is the value of the thing of which the plaintiff has been deprived by the breach. Liberty Bank v. Talman Home Mortg. Corp., 877 F.2d 400, 406 (5th Cir. 1989). We are satisfied that the same measure of damages, the value of the benefit denied, is the appropriate measure of damages in this case.[5] Accordingly, monetary relief in the amount of the benefit denied is the appropriate remedy.

IV.

While acknowledging that the issue has never been addressed by the Fifth Circuit, USF&G contends that Section 502 limits the source of recovery to the amounts of the plan so that the pension plan itself is the only party properly named as a defendant. The Schwegmann Defendants have also adopted this argument.

The Defendants rely primarily on the language of Section 502 (d)(2), which reads as follows:

> Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchaper. 29 U.S.C. § 1132 (d) (2).

While the language suggests that the plan is the only proper party defendant, other Circuits have allowed employees to maintain actions against their employers for the denial of benefits under facts similar to those in this case. See Mein v. Carus Corporation, 241 F.3d 581 (7th Cir. 2001); Garren v. John Handcock Life Insurance, 114 F.3d 186 (11 Cir. 1997); Layes v. Mead Corporation, 132 F.3d 1246 (8th Cir. 1998); Sweet v. Consolidated Aluminum Corporation, 913 F.2d 268 (6th Cir.

---

[5] Because we have found a remedy is available at law under Section 502 (a)(1)(B), the Plaintiffs are foreclosed from equitable relief under Section 502 (a) (3). Great-West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204, 122 S.Ct. 708 (2002).

1990).  These cases hold that the plan beneficiaries can sue the employer when it was the employer's decision to deny benefits.  Sweet v. Consolidated Aluminum Corporation, 913 F.2d 268 (6th Cir. 1990) and when the employer is the plan administrator or sponsor.  Garren v. John Handcock Life Insurance, 114 F.3d 186 (11 Cir. 1997); Layes v. Mead Corporation, 132 F.3d 1246 (8th Cir. 1998).[6]

In this case, Plaintiffs named both the SGSM Pension Plan and SGSM as defendants in this lawsuit.  SGSM is both the "plan administrator" and "plan sponsor."  The SGSM Pension Plan has no meaningful existence separate from SGSM because the Voucher Plan is funded by the general assets of the partnership.  Moreover, it was indisputably SGSM's decision to deny further vouchers or their cash equivalent to the Plaintiffs.  Under these facts, the district court correctly held that SGSM was properly named as a defendant.

V.

Next, the Schwegmann Defendants argue that the district court erred in casting John Schwegmann, Jr. in judgment as a fiduciary to the Voucher Plan.  Relying on Rockney v. Blohorn, 877 F.2d 637 (8th Cir. 1988), the Schwegmann Defendants contend that Mr. Schwegmann has no personal

---

[6] "Administrator" is a defined term under ERISA.  29 U.S.C. § 1002 (16) (A).  29 U.S.C. § 1002 (16) reads:
   (A) The term "administrator" means --
       (i) the person specifically so designated by the terms of the instrument under     which the plan is operated;
       (ii) if an administrator is not so designated, the plan sponsor; or
       (iii) in the case for which an administrator is not designated and a plan sponsor     cannot be identified, such other person as the Secretary may by regulation     prescribe.
   (B) the term "plan sponsor" means (i) the employer in the case of an employee benefit plan established or maintained by a single employer, . . .

As there is no instrument designating a plan administrator, SGSM is "plan administrator" under (A)(ii) because it is the "plan sponsor" under subsection (B) of the statute.

liability because the district court rejected Plaintiffs' attempt to pierce the corporate veil. However, Rockney v. Blohorn is inapposite.

Rockney addressed the liability of a corporate officer who was sued under the theory that he was the employer and plan administrator for the purposes of ERISA. Here, the district court predicated Mr. Schwegmann's liability on a finding that Mr. Schwegmann was a plan fiduciary, not that he was Plaintiffs' employer or the plan administrator. This is an independent basis for liability unrelated to whether he was also the Plaintiffs' employer under a veil piercing theory.

Under ERISA, a person is a fiduciary with respect to a plan to the extent:

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 405(c)(1)(B) [29 USCS § 1105(c)(1)(B)]. 29 U.S.C. § 1002 (21)

In concluding that Mr. Schwegmann was a plan fiduciary, the district court relied on Kayes v. Pacific Lumber Company, 51 F.3d 1449 (9th Cir. 1995). In Kayes, the Ninth Circuit acknowledged that ERISA adopted a functional approach to determining whether an individual was liable as a fiduciary. The court held two corporate officers personally liable as plan fiduciaries because of the role they played in the management of the plan's assets, despite the fact that the ERISA plan designated the corporate employer as the plan fiduciary.[7] The Kayes court noted that to hold otherwise would

---

[7] In doing so, the Kayes court expressly rejected the approach taken by the Third Circuit in Confer v. Custom Engineering Co., 952 F.2d 34 (3rd. Cir. 1991) which held that when a plan has designated a corporation as its fiduciary, only the designated fiduciary is chargeable for a breach of a fiduciary duty. In the present matter, the district court distinguished Confer on the grounds that there was no written plan in this case designating a corporate fiduciary. This is consistent with the holding of the Ninth Circuit in Yeseta v. Paybra Mining Co., 837 F.2d 380

allow a corporation to shield its officers from liability under ERISA and relieve them of their fiduciary duty.  Id. at 1460. In Bannistor v. Ullman, 287 F.3d 394, 403-404 (5th Cir. 2002), we confirmed that this Circuit uses the same functional approach as the Ninth Circuit in Kayes, stating:

> The term "fiduciary" is liberally construed in keeping with the remedial purpose of ERISA. Am. Fed. of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the United States, 841 F.2d 658, 662 (5th Cir.1988). "The phrase 'to the extent' indicates that a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority or control." Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc., 793 F.2d 1456, 1459-60 (5th Cir.1986), cert. denied, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987); 479 U.S. 1089, 107 S.Ct. 1298, 94 L.Ed.2d 154. However, "'fiduciary' should be defined not only by reference to particular titles, . . . but also by considering the authority which a particular person has or exercises over an employee benefit plan." Donovan v. Mercer, 747 F.2d 304, 308 (5th Cir.1984).

Thus, the district court correctly held that Mr. Schwegmann could be liable as a fiduciary even if he is not the Plaintiffs' employer under a veil piercing theory.

VI.

Rather than contesting whether Mr. Schwegmann exercised the requisite control or authority over the plan sufficient to establish a fiduciary duty, the Schwegmann Defendants next argue that the decision to liquidate SGSM and end the Voucher Plan was not a fiduciary action.  The Schwegmann Defendants are correct that the decision to terminate a plan under ERISA does not constitute a breach of fiduciary duty.  See Izzarelli v. Rexene Prods. Co., 24 F.3d 1506, 1524 (5th Cir. 1994).  The court, however, did not impose liability against Mr. Schwegmann because he terminated the plan.  Instead, the district court predicated Mr. Schwegmann's fiduciary liability on acts that took place before SGSM terminated the Voucher Plan.

---

(9th Cir. 1988), which was recently cited with approval by this court in Bannistor v. Ullman, 287 F.3d 394 (5th Cir. 2002).

The district court found that Mr. Schwegmann and the other Schwegmann Defendants failed to fulfill many of their fiduciary duties under ERISA including their disclosure and reporting obligations, ERISA's minimum funding requirements, and the requirement that the plans assets be held in trust. The Schwegmann Defendants do not challenge the correctness of this list of statutory breaches. As noted by the district court, it was not the decision to terminate the plan which denied the Plaintiffs their benefits but the longstanding failure to provide an independent source of funding which caused the Plaintiffs to lose their benefits when SGSM's business folded. If the plan had been properly funded, the Plaintiffs would not have been deprived of benefits upon the plan's termination. 29 U.S.C. § 1344.

Because fiduciary liability was predicated on statutory violations, such as failing to fund the plan, which took place prior to SGSM's decision to end the Voucher Plan, the district court did not err in finding that the Mr. Schwegmann and the other Schwegmann Defendants breached their fiduciary duty under ERISA. Thus, the district court correctly awarded judgment against the Schwegmann Defendants and in favor of the Plaintiffs in their capacity as representatives of the plan under Section 409 of ERISA. 29 U.S.C. § 1109.

## VIII.

The Schwegmann Defendants summarily argue that none of the Plaintiffs are vested. While Defendants contested in the district court whether certain individual plaintiffs met the requirements for participation in the Voucher Plan, the Schwegmann Defendants failed to raise any general argument that no Plaintiffs had vested. Likewise, Plaintiffs contend that USF&G argues for the first time on appeal that the only party which can bring this suit is the Pension Benefits Guaranty Corporation. USF&G has failed to direct us to any record citation in which it raised the issue below.

-19-

"As a general rule, a party may not allude to an issue in the district court, abandon it at the crucial time when the district court might have been called to rule upon it, and then resurrect the issue on appeal." Louque v. Allstate Ins. Co., 314 F.3d 776, 799 (5th Cir. 2002). Accordingly, we decline to consider these issues on appeal.

IX.

Finally, USF&G argues that, assuming the Voucher Plan is covered by ERISA, the self-insured retention (SIR) of $250,000 in its excess liability policy applies to each individual plaintiff's claim. Thus, USF&G contends that it is not responsible for any part of the judgment because each claim falls below the SIR.

The SIR provision contains only one line reading: "$250,000 each claim." Neither the SIR nor any other section of the policy defines the term "claim." The district court ruled that the failure to define this term rendered the policy ambiguous as a matter of law. Construing the policy against USF&G, the district court concluded that the term "claim" refers to a demand for coverage by the insured, SGSM, rather than the claims made against SGSM.

However, the absence of an express definition does not automatically render a policy term ambiguous. Norfolk Shipbuilding & Drydock Corporation v. Seabulk Transmarine Partnership, Ltd., 274 F.3d 249, 254 (5th Cir. 2001). Under the basic tenets of contract interpretation, each of the policy's provision must be read in light of the others. La. Civ. Code Art. 2050. Here, the meaning of "claim" for the purposes of the SIR provision can be gleaned by reference to the use of the word in numerous other provisions of the policy.

The policy includes three "coverage forms:" Excess General Liability Coverage, Excess Employee Benefits Coverage and Excess Liquor Coverage. Plaintiffs assert their claims under the

-20-

Excess Employee Benefits Coverage form. The policy has a number of definitions and other

provisions that apply to all coverages and provisions that apply only to Excess Employee Benefits

Coverage. The provisions of the USF&G policy that apply both to all coverages and those that apply

to the specific coverage at issue here consistently refer to claims made "against the insured" or claims

"by the employee."[8] The term "claim" in the SIR provision, when read in light of these other

---

[8] The following provisions apply to Excess Employee Benefits Coverage:

SECTION I - COVERAGE
    1. Insuring Agreement
        b. This insurance applies to an "employee benefit incident" only if:

        (3) A **claim** for damages because of the "employee benefit incident" is first made **against any insured**, in accordance with paragraph c. below, during the policy period or any Extended Reporting Period we provide under EXTENDED REPORTING PERIODS (Section IV).
        c. **A claim by any "employee"** or the dependant or beneficiaries of any "employee" seeking damages will be deemed to have been made at the earlier of the following times:
        (1) When notice of such claim is received and recorded by an insured
or by us .

        All claims for damages because of injury to the same "employee", including damages claimed by any beneficiary or dependent, arising out of the same "employee benefits incident"will be deemed to have been made at the time the first of these **claims is made against the insured**. (emphasis added).

SECTION III - LIMITS OF INSURANCE
    1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of insureds, claims made, "suits" brought or "employees" or dependents or beneficiaries of **employees making claims or bringing "suits"**. (emphasis added).

The following provisions apply to all coverage provided by the policy:

G. DUTIES IN THE EVENT OF OCCURRENCE, ACCIDENT, CLAIM OR SUIT
    3. You and any other involved insured must:
        e. Attempt to settle the claim or suit within the Self-Insured Retention

-21-

provisions of the policy, is clear and unambiguous and provides that a "claim" is the assertion of a legal right against the insured by a third party.

One of the foremost authorities on insurance law states that "[g]enerally speaking, a 'claim' in a liability policy is considered to be an assertion by a third-party to the effect that the insured has caused the claimant damages through some acts or omissions and that the claimant intends to hold the insured responsible for all or a portion of the damages so caused." 20 Eric Mills Holmes, Holmes' Appleman on Insurance 2d, § 130.2 (2002). Our conclusion that the term "claim" in the SIR provision means the assertion of a right by a third person against the insured is, thus, consistent with the generally understood meaning of this term.

Our conclusion is likewise consistent with that of other courts. For example, in National State Bank, Elizabeth N.J. v. American Home Assurance, Co., 492 F.Supp. 393 (S.D. N.Y. 1980), the district court held that the undefined term "claim" referred to claims by third parties against the insured. In National State Bank, several lawsuits were filed against the insured, each of which sought recovery for the insured's negligent failure to report misstatements contained in financial records the

---

Limit.

    Q.  SEPARATION OF INSUREDS
        Except with respect to the Limits of Insurance, "self-insured retention", and any
        rights or duties specifically assigned to the first Named Insured, this insurance
        applies:

        1.    As if each Named Insured were the only Named Insured; and
        2.    Separately to each **Insured against whom claim is made** or "suit" is
              brought.(emphasis added).

    COMMON INVESTIGATION, DEFENSE AND SETTLEMENT PROVISIONS

        We will not be obligated to assume charge of the investigation , defense or
        settlement of **any claim or "suit" against the insured**, . . . (emphasis added).

-22-

insured was charged with auditing. The lawsuits were consolidated and later settled. Under the terms of the settlement, the insured assigned the plaintiffs its rights under a liability policy issued by American Home Insurance (American). After the underlying litigation was settled, the sole remaining issue was the extent of American's liability to the plaintiffs.

American contended that a "claim" in the Limits of Liability provision, means "a 'demand made by the insured for protection under the Policy.'" Id. at 395. The plaintiffs argued that a "claim" was the individual plaintiff's assertion against the insured. The court rejected American's argument and adopted the plaintiffs' interpretation of the contract. Although the term "claim" was not defined in the American policy, the court found that the word was not ambiguous when read in the context of the policy as a whole. Id. at 396. The court noted that the provisions consistently applied to "claims against" the insured. Id. The court acknowledged that "claim" need not have the same meaning in each of the policy's sections; however, the court found that the policy was devoid of any language which would support American's argument. Thus, based on the language of the policy as a whole, the "clear contextual implication of these statements is that the word 'claim' refers to an assertion of a legal right by a third-party against the insured." Id.

We agree with the National State Bank court's analysis and conclude that "claim" in the SIR refers to a demand by a third party against the insured and not to a demand for coverage by the insured against its insurer.

We are also unable to accept the district court's conclusion that the action by the Plaintiff class should be considered a single claim. Most other courts define the term "claim" as an individual cause of action. See Colbert County Hospital v. Bellefonte Insurance Co., 725 F.2d 651 (11th Cir. 1985); Maxim Manufacturing Corporation v. Alliance General Insurance Co., 911 F.Supp. 239 (S.D. Miss.

-23-

1995).  For example,  in <u>Maxim Manufacturing Corporation v. Alliance General Insurance Co.</u>, the court considered whether the SIR in a policy was triggered once or twice by a lawsuit for the wrongful death of two children killed in a fire caused by a product distributed by the insured.  Like the USF&G policy, the SIR applied to "each claim."  Though the policy did not define "claim," the court found that the term unambiguously referred to an individual cause of action.  Because a separate action could have been brought on behalf of each of the decedents' estates, two claims were made, and accordingly, the SIR applied twice.

Similarly, in <u>Colbert County Hospital v. Bellefonte Insurance Co.</u>, <u>supra</u>, the Eleventh Circuit considered whether a lawsuit filed by a former patient treated at the hospital asserted one claim under the terms of the Hospital's insurance policy or three.  The patient was injured in three separate operations all performed at the Hospital by the same doctor on separate occasions.  The insurer, Bellefonte Insurance Co., contended that the plaintiff had asserted a single claim because the term "claim" in the Limits of Liability provision meant a single lawsuit or a single lawsuit filed by a single plaintiff.  The court disagreed and stated  that the term "claim" and "suit" were used in the disjunctive in the provision, indicating that the terms had distinct meanings.  <u>Id</u>. at 653.  Thus, it rejected the insurer's interpretation of claim and held that because the plaintiff had three separate causes of action, the plaintiff had three separate claims against the insured.  <u>Id</u>.

In support of their argument that this class action is a single "claim,"[9] Plaintiffs primarily rely

_____

[9]  Plaintiffs cite <u>North American Biologicals Inc. v. Illinois Employers Ins. Of Wausau</u>, 931 F.2d 839 (11th Cir. 1991), in support of their argument that a class action is a single claim for the purposes of the SIR.  We have carefully considered <u>North American Biologicals</u> but find it inapposite.  The district court in <u>North American Biologicals</u> had denied the plaintiff's application for class certification.  Thus, there was only one finite claim involved in the lawsuit.

We are also unpersuaded by the Plaintiffs' reliance on <u>Previews, Inc. v. California Union Insurance Company</u>, 640 F.2d 1026 (9th Cir. 1981), in which an Erie bound Ninth Circuit

-24-

on a notification provision in the USF&G policy which requires the insured to notify USF&G of "each claim or suit" which presents an unusual exposure to coverage.[10] We disagree with the Plaintiffs that this phrase equates suit and claim. The plain meaning of this phrase–which uses the disjunctive–indicates that the two words have different meanings. This is particularly true in the context of the notification provision in which the words are used. We see no reason the insurer would want to limit the insured's obligation to give notice of either a suit or claim. The insurer needs and expects the insured to notify it of either a claim or a suit. Appellee's argument to the contrary is unpersuasive. See Colbert County Hospital v. Bellefonte Insurance Co., 725 F.2d 651, 653.

Finally, the Plaintiffs argue that because no individual employee benefit claim arising out of Schwegmann's Voucher Plan could ever exceed the $250,000 SIR, the SIR cannot apply more than once to multiple claims arising out of the same occurrence because to do so would render the policy worthless. This argument overlooks at least two important considerations. First, Schwegmann selected the SIR to accomplish its insurance objectives. Schwegmann knew the details of its employee benefit plan and was able to weigh the level at which USF&G's coverage would be triggered against

---

followed a California appellate court's decision without independently analyzing the issue of whether a class action constitutes a single claim.

[10] The provisions on which the Plaintiffs rely read as follows:

2. The First Named Insured shown in the declarations will furnish us with the following:

c. Written notification of each claim or "suit" which involves serious injury(ies) or damages. This notice must be provided as soon as possible, but no later than ten (10) business days from the date you have knowledge of such claim or "suit". Serious injuries or damages include, but are not limited to:
> (12) Any claim or "suit" not specified above that presents an unusual exposure to the coverage. Examples include: class actions, environmental exposure and bad faith allegations; or
> (13) Any other serious injury or damage which may involve our liability.

the premium it was willing to pay. Second and relatedly, the SIR applied to all of Schwegmann's coverages under the USF&G policy, including the general liability policy. Schwegmann certainly had potential exposure above the SIR under this coverage. So, we are satisfied that enforcing the SIR as written does no violence to the expectations of the parties.

In sum, we are satisfied that "claim" as used in the SIR is not ambiguous. It refers to an individual demand or cause of action asserted by a third party against the insured. Because each of the class members has a separate cause of action against the Schwegmann Defendants and could have filed an individual lawsuit against the Schwegmann Defendants for recovery of pension benefits, the SIR applies separately to each of their claims. None of the individual employee's claims exceed the $250,000 SIR, and we must therefore vacate the judgment against USF&G.[11]

X.

For the reasons stated above, we VACATE the judgment against USF&G. We affirm the judgment in all respects against the remaining Defendants and remand this case to the district court for entry of judgment consistent with this opinion.

AFFIRMED in part.

VACATED in part and

REMANDED.

---

[11] Because none of the individual claims brought by the Plaintiffs meet the SIR, we need not reach the issue of whether the policy coverage was triggered by a qualifying event.