IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 20, 2008

Charles R. Fulbruge III
Clerk

No. 07-40477

JUDY NICHOLS, Individually and on behalf of the Alcatel Network Systems Salaried Retirees Benefit Program and other persons similarly situated; JERRY BROWN, Individually and on behalf of the Alcatel Network Systems Salaried Retirees Benefit Program and other persons similarly situated; ROBERT BRALEY, Individually and on behalf of the Alcatel Network Systems Salaried Retirees Benefit Program and other persons similarly situated; ERMA SCOTT, all persons in the proposed Union Retirees class; INTERNATIONAL UNION ELECTRONIC, CWA Local 86787, Individually and on behalf of the Group Insurance Plans, and others similarly situated; IUE, The International Division of Communication Workers of America, AFL-CIO, CLC (IUE-CWA),

Plaintiffs-Appellants,

v.

ALCATEL USA, INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Texas

Before JONES, Chief Judge, and BARKSDALE and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This putative class action concerns the elimination of retirement medical benefits for workers who retired from Alcatel USA, Inc. ("AUSA") or its predecessors. The retirees in this action are divided into two groups: Salaried Retirees and Union Retirees (collectively "the Retirees"). AUSA provided the

Salaried Retirees with a Salaried Retirees Benefit program and agreed to provide medical benefits to Union Retirees under collective bargaining agreements and other similar arrangements. The Salaried Retirees contend that the Benefit program is a pension plan and consequently subject to vesting under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. They are also alleging claims of ERISA-estoppel and breach of fiduciary duty. The Union Retirees contend that AUSA does not have the right to increase the cost of retiree health benefits because they are fixed lifetime benefits which individually vested at the time of each retiree's retirement based upon the agreement and course of action between the parties. The Retirees filed a motion for preliminary injunction, which was subsequently denied by the district court. The Retirees timely filed their notice of interlocutory appeal. Finding no error, we AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2003, AUSA announced that it planned to implement changes to certain of its retiree medical welfare benefit plans, including a gradual reduction over a three-year period in the amount of its contribution to the costs of medical benefits. On March 17, 2005, four individual Retirees: Judy Nichols, Jerry Brown, Robert Braley, and Erma Scott, as well as two unions: the IUE, International Division of the Communications Workers of America, AFL-CIO, CLC (IUE-CWA) and the IUE-CWA Local 86787, filed this lawsuit, contesting the changes to the benefit plans. All of the Retirees alleged claims under § 502(a) of ERISA, 29 U.S.C. § 1132(a). The Union Retirees also alleged a claim under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Ultimately, the Retirees were seeking "to reinstate cancelled benefits, to undo reductions in benefits, to be 'made whole' for losses due to [AUSA's] actions, to preserve and continue the medical benefits for the lifetimes of the retirees, eligible dependents, and surviving spouses, and to recover

attorney fees and costs." On October 16, 2006, the Retirees filed a motion for preliminary injunction seeking class-wide injunctive relief[1] on behalf of the Salaried Retirees participating in AUSA's Plan B Retirement Medical Plan and the Union Retirees participating in AUSA's Plans E and F Retirement Medical Plans.[2] Specifically, the Retirees sought to prevent AUSA from: (1) eliminating any portion of the health coverage savings accounts for Salaried Retirees; (2) charging more for health insurance for Union Retirees who retired before May 2, 2000, than the monthly rate of $22 for individuals and $47.93 for families; (3) increasing any health insurance costs to Union Retirees beyond 25% of the plan costs; and (4) increasing the health insurance costs to the Retirees until the rates can be justified. Pertinent background information regarding the three retirement medical plans at issue in this case is included below.

Plan B: This plan includes the Salaried Retirees from several AUSA facilities who retired between April 4, 1993 and December 31, 2002, and who met the eligibility requirements or were grandfathered. Under this plan, Salaried Retirees from AUSA can participate in the medical coverage option, participate in the prescription drug only option, or elect to participate in a non-AUSA medical plan. AUSA contributed to the cost of the medical coverage through a calculated "medical credit."[3] No actual money was set aside to fund the medical

---

[1] The Retirees' motion for class certification has not been granted by the district court. After they filed the motion, AUSA opposed in part and agreed in part with the request for class certification. However, after the district court entered its order dismissing their motion for preliminary injunction, the Retirees filed a motion to withdraw their request for class certification. Neither the motion for class certification nor the motion to withdraw were resolved by the district court before it entered a stay of the proceedings pending this court's ruling on the present interlocutory appeal.

[2] AUSA has seven different retiree welfare plans. None of the named Retirees or any of the individuals who testified or submitted declarations at the hearing in the district court in support of the Retirees' motion participate in Plans A, C, D, or G. Of the four named Retirees, only Scott is a Union Retiree; the other three are Salaried Retirees.

[3] The amount of the medical credit was determined through a calculation that multiplied each year of credited service an employee had with the company by $1,000 (a spouse

credits; rather the credits were conceptual "buckets of money." AUSA only contributed to medical coverage costs up to the amount of the medical credit, regardless of how much premium amounts increased. Accordingly, retirees under this plan could only offset their medical premiums up to the amount of the aggregate medical credits that have been granted to them through the allocations of the monthly medical amount. If their insurance premiums were less than the monthly medical amount, any excess remained available to them for future medical premiums. AUSA did not issue any 1099s to Plan B retirees for the amount of the medical credits.

When Plan B was introduced, AUSA, through Terry Latham, its former Vice President of Human Resources, explained to the employees that there was no funding or vesting in this plan and that AUSA reserved the right to change, amend, or terminate the Plan for any reason or purpose.[4] The operative documents for the plan are the Plan Document and Summary Plan Description ("SPD") and a brochure entitled "Straight Talk About Your Retirement Program" ("Straight Talk brochure"). The SPD states that the plan is a "self-funded employee welfare benefit plan" and expressly states that the plan does not create a vested right. Similarly the Straight Talk brochure explains that: "There is no cash option under this Plan. You may only use the Retirement Medical Credit to help pay premiums for retirement medical coverage." "A memo about Plan B" also states that "the post-retirement medical plan could change in the future, just as the current retirement medical plan could change."

---

had a separate calculation that multiplied each year of credited service by $500). Once this amount was calculated, it was annuitized using life expectancy charts to determine a monthly medical amount. One the retiree and/or the eligible spouse became eligible for Plan B, AUSA credited them this medical amount on a monthly basis. The monthly medical amount was cut in half once the retiree and/or spouse reached age 65.

[4] Latham testified for the Retirees at the hearing. He became the Vice President of Human Resources for AUSA in 1991, and he remained in that position until 1998.

In November 2003, AUSA announced that its contribution to the costs of medical benefits for retirees under this Plan was going to be reduced to zero by January 1, 2006.[5] To that end, AUSA reduced its maximum contribution to 66% in 2004, 33% in 2005, and 0% in 2006 and thereafter. Currently, AUSA continues to offer retiree medical and prescription drug benefits through Plan B. However, it no longer provides Plan B retirees with new medical credits to offset the cost of coverage. Any monthly medical credits that were granted prior to the plan change continue to be available to retirees until exhausted.

Plan F: This plan covers bargaining unit members who retired from January 1, 1986 until before the last collective bargaining agreement ("CBA") became effective on May 1, 2000. This plan never included medical credits; rather union retirees could pay $22 or $47.93 to receive single or family coverage, respectively. In each CBA in the record, retiree medical benefits are addressed in Article XX. Article XX of the 1985 CBA states that the insurance provisions will remain available during the term of the agreement and also states that once a retiree and/or their dependent "attains age sixty-five (65) the coverage will be a Medicare carve out." The other CBAs in the record contain similar language. The SPD for Plan F explains:

> Alcatel Network Systems, Inc. reserves the right to change in any manner or to terminate all or any part of the Plan at any time and to cancel all or any part of the coverages and benefits under the Plan, except that if the Plan is maintained pursuant to a collective bargaining contract no such action shall be taken during the term of such contract or at any time thereafter until Alcatel Network Systems, Inc. has complied with any collective bargaining obligation which it may have with respect to the Plan.

Latham testified that the premiums had been set at the rate of $22 for single coverage and $47.93 for family coverage since he initially became

---

[5] Previously, in 2002, AUSA froze eligibility for participation in Plan B.

responsible for the union retirees in 1983.[6]  While he contemplated raising the premiums, he was told that there was a letter of understanding between AUSA and the union that the rates were fixed.  Latham never asked to see the letter, and unlike other letter agreements, this purported agreement was never incorporated into any CBA.

On August 24, 2001, AUSA Marketing, Inc. ("AUSA Marketing") sold its division that contained the bargaining unit to another company.  Prior to the sale, AUSA Marketing negotiated an agreement ("Termination Agreement") with the union that terminated the existing CBA and resolved any outstanding obligations.  The Termination Agreement states in part that "[t]he Union acknowledges that the Company has fully satisfied its contractual obligations under the CBA . . . . [T]he Company has satisfied all reimbursement, benefit contributions and other contractual obligations to the Union and bargaining unit employees under the CBA."

AUSA continued to require contribution rates at $22 and $47.93 until January 1, 2004, when it incrementally began raising the contribution rates to the total cost of the medical coverage under AUSA plans as of January 1, 2006.

Plan E:  Bargaining unit members who retired after May 2, 2000 are covered under this plan.  Plan E never included medical credits; these retirees pay 25% of the cost of the standard medical option offered by AUSA.  Thus, these retirees contribute only 25% of the cost that other retirees pay for coverage under the retiree medical standard option, or any other option that costs less than the standard option, with the exception that retirees who select the

---

[6] The practice of using, fixed premiums of $22 and $47.93 was established by Rockwell International Corp., AUSA's predecessor.

prescription drug only option pay 100% of the cost. AUSA has maintained Plan E retirees' medical coverage at 25% under the standard plan.[7]

On March 17, 2005, the Retirees filed this putative class action; they filed a motion for preliminary injunction on January 3, 2006. The district court dismissed the motion without prejudice on September 27, 2006. Several weeks later, on October 16, 2006, the Retirees re-filed the motion. On December 20, 2006, the district court held an evidentiary hearing on the Retirees' motion, and, after the hearing, the district court allowed the parties to supplement the record with additional evidence. During the hearing, the district court allowed a number of witnesses to testify as to the Retirees' claim of irreparable harm. These witnesses were all AUSA retirees (or their spouses) who had canceled their health coverage with AUSA since the aforementioned changes were implemented. In issuing its factual findings, the district court determined that each of the witnesses had medical coverage and none of them were unable to afford adequate medical care.[8] Further, the district court concluded that although a number of the witnesses, including Nichols, testified that when they retired they believed that their medical benefits would be "locked-in," none of them testified that a specific AUSA employee misrepresented that the medical plans could not be changed or terminated in the future.

The district court went on to lay out its conclusions of law and ultimately denied the requested injunction. In so doing, the court concluded that the Retirees had not demonstrated a substantial likelihood of success on the merits

---

[7] None of the individuals who were involved in the hearing below ever participated in Plan E. Nevertheless, the Retirees "request[ed] an accounting of the costs and an injunction prohibiting the arbitrary and unsubstantiated increase until an acceptable accounting is provided."

[8] The court did note that some of the witnesses testified that they had to either take on additional employment in order to receive health care benefits or that they had to rely on the health benefits their spouses received.

for any of their claims. While the court did not find that the proposed injunction would disserve the public interest, it did hold that the Retirees had neither demonstrated a substantial threat of irreparable injury nor that the harm to the Retirees outweighed the potential prejudice to AUSA if the injunction were entered. The Retirees filed a notice of interlocutory appeal on May 8, 2007, appealing the district court's denial of injunctive relief pursuant to 28 U.S.C. § 1292(a)(1). On June 19, 2007, the district court granted a stay in the proceedings pending the resolution of this appeal.

## DISCUSSION

We review a district court's decision to grant or deny a motion for preliminary injunction for an abuse of discretion. Planned Parenthood of Houston & S.E. Tex. v. Sanchez, 403 F.3d 324, 329 (5th Cir. 2005) (citing Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32 (1975) ("While the standard to be applied by the district court in deciding whether a plaintiff is entitled to a preliminary injunction is stringent, the standard of appellate review is simply whether the issuance of the injunction . . . constituted an abuse of discretion.")). "A decision grounded in erroneous legal principles is reviewed de novo." Sanchez, 403 F.3d at 329 (internal citation omitted).

Plaintiffs seeking a preliminary injunction must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest. Id. "A preliminary injunction is an 'extraordinary remedy' and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." Id. (internal quotation marks and citation omitted). The parties do not dispute that the Retirees' requested injunction would not disserve the

public interest; accordingly we now turn to examine whether the Retirees have carried their burden as to the first three requirements.

A. Substantial Likelihood of Success on the Merits

The Retirees raise a number of claims; accordingly we examine the likelihood of success on the merits of each claim in turn.

1. Salaried Retirees' ERISA § 502(a)(1)(B) claim

ERISA § 502(a)(1)(B) states that: "A civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Retirees argue that the district court improperly concluded that Plan B is an employee welfare benefit plan ("welfare plan") and not an employee pension benefit plan ("pension plan"), and therefore the district court improperly assessed the claim under § 502(a)(1)(B) of ERISA. According to the Retirees, Plan B worked like a savings account and provided retirees with deferred retirement income, albeit to be used for payment of medical insurance premiums, and therefore it met the requirements of a pension plan. They contend that since it is a pension plan, it is subject to vesting, notwithstanding language in the Plan's controlling documents to the contrary. We disagree.

Under ERISA, there are two kinds of plans: welfare plans and pension plans. The former is defined as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . ." 29 U.S.C. § 1002(1). A pension plan is defined as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as

a result of surrounding circumstances such plan, fund, or program–
(i) provides retirement income to employees, or (ii) results in a
deferral of income by employees for periods extending to the
termination of covered employment or beyond, regardless of the
method of calculating the contributions made to the plan, the method
of calculating the benefits under the plan or the method of
distributing benefits from the plan.

29 U.S.C. § 1002(2)(A). The statute also states: "In the case of any arrangement or payment a principal effect of which is the evasion of the standards or purposes of this chapter applicable to pension plans, such arrangement or payment shall be treated as a pension plan." 29 U.S.C. § 1002(2)(B). Determining whether an agreement constitutes a welfare or pension plan is a question of fact. Hansen v. Continental Ins. Co., 940 F.2d 971, 976 (5th Cir. 1991).

Unlike welfare plans, pension plans are highly regulated with strict statutory vesting requirements. 29 U.S.C. § 1051(1); Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co., 520 U.S. 510, 515 (1997) ("It is true that ERISA itself does not regulate the substantive content of welfare benefit plans. Thus, unless an employer contractually cedes its freedom, it is generally free under ERISA, for any reason at any time, to adopt, modify, or terminate its welfare plan." (internal citations omitted)); Curtiss-Wright Corp. v Schoonejongen, 514 U.S. 73, 78 (1995) ("Nor does ERISA establish any minimum participation, vesting, or funding requirements for welfare plans as it does for pension plans.").

Here, it is undisputed that Plan B is described in all of the Plan documents as a welfare plan and that the SPD explicitly states that the Plan did not create any vested rights. Having reviewed the record, we conclude that none of the documentation or oral representations from AUSA could have reasonably led anyone to believe that Plan B was a pension plan. Moreover, under the clear language of ERISA, Plan B qualifies as a welfare plan: the medical credits could

only be applied to medical and prescription drug plan premiums, and they could never be redeemed for cash. See 29 U.S.C. § 1002(1). Further, as the district court wrote, there was no funding of the medical credits or any vesting, two elements that are required for pension plans.

The Retirees argue that the medical credit qualified as income, and they contend that the district court erred by not considering either *Musmeci v. Schwegmann Giant Super Markets, Inc.*, 332 F.3d 339 (5th Cir. 2003) or *Stoffels v. SBC Communications, Inc.*, 430 F.Supp. 2d 642 (W.D. Tex. 2006). In *Musmeci*, a panel of this Court held that grocery vouchers qualified as retirement income. 332 F.3d at 345. Relying on "the interconnection between ERISA and the [Internal Revenue Code ("IRC")]," the panel highlighted that the employer treated the vouchers as retirement income because it deducted the expenditures on its tax returns and issued the retirees 1099 tax forms for the value of the vouchers. Id. The panel also explained that terms like "income," which overlap in ERISA and IRC should be "consistently defined in both." Id. The reasoning of *Musmeci*, far from supporting the Retirees' arguments, is actually consistent with AUSA's position, since the IRC states that as a general rule "gross income of an employee does not include employer-provided coverage under an accident or health plan." 26 U.S.C. § 106(a). Here, the record establishes that AUSA never issued 1099 tax forms to retirees for Plan B benefits; rather, AUSA submitted to the IRS annual 5500 reports where Plan B was represented as a welfare plan with no assets. In fact Latham, who designed Plan B, testified for the Retirees, and was himself a Plan B participant, admitted that he never treated the medical credits as income and that he never reported them on his tax returns. In light of this all, the district court's failure to cite *Musmeci* was not in error.

Similarly, *Stoffels* is not applicable here. In that case, the district court concluded that the free or discounted telephone service provided to retirees was

a cash equivalent that qualified as income. 430 F.Supp. 2d at 653. However, unlike the Salaried Retirees here, the plaintiffs in Stoffels were taxed for the benefits they received from their former employer. Id. at 645. In sum, neither Musmeci or Stoffels involved medical benefits, nor is the reasoning in those opinions applicable here; the district court did not err by not considering them.

Since we have no difficulty concluding that Plan B is a welfare plan, we hold that the district court properly concluded that the Salaried Retirees have not demonstrated a substantial likelihood of success on the merits on their ERISA § 502(a)(1)(B) claim.

2. Salaried Retirees' ERISA-estoppel claim

Next, the Salaried Retirees assert that AUSA misrepresented the existence of guaranteed lifetime medical benefits and is therefore estopped from asserting either that Plan B does not vest or that it may be amended, modified, or terminated at AUSA's will. Specifically, the Retirees argue that the language in the SPD is misleading and ambiguous because employees were led to believe that separate, personal medical accounts were created upon retirement.[9] They argue that retirees, such as Nichols, relied on AUSA's misrepresentations when they retired early because they were led to believe that they would receive medical credits for life. Once again, we agree with the district court that the Retirees are unlikely to succeed on this claim as they failed to establish the requisite elements of an ERISA-estoppel claim.

---

[9] Further, the Salaried Retirees argue that the following terms of the Plan misled them into believing that the plan could only be changed for active "employees," but not for "retirees:"

The Plan may be changed by the Employer upon the execution of an Amendment at any time without your prior notice or consent.

Your Employer may terminate the Plan at any time; however, the Employer has established the Plan with the intent to maintain it for an indefinite period of time.

In order to establish an ERISA-estoppel claim, a plaintiff must prove: (1) a material misrepresentation, (2) reasonable and detrimental reliance upon that representation, and (3) extraordinary circumstances. Mello v. Sara Lee Corp., 431 F.3d 440, 444-45 (5th Cir. 2005). "ERISA-estoppel is not permitted if based on purported oral modification of plan terms." Id. at 446 (internal quotation marks and citation omitted). Also, there can be no "reasonable reliance on informal documents in the face of unambiguous Plan terms." Id. at 447; see High v. E-Systems, Inc., 459 F.3d 573, 580 (5th Cir. 2006) ("[A] 'party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party.'" (quoting Sprague v. GMC, 133 F.3d 388, 404 (6th Cir. 1998))).

Based on our review of the record, the Salaried Retirees have not satisfied either of the first two elements.[10] First, they have not established any material misrepresentation. When the Plan documents are examined in whole it is clear that the Plan language indicates that none of the benefits in the Plan vested and that AUSA explicitly reserved the right to change or terminate the Plan at any time. Second, even assuming that there had been a material misrepresentation, the Salaried Retirees have not established the second element: reasonable and detrimental reliance upon that representation. The district court highlighted that none of the named Retirees or witnesses who testified admitted to ever reading or relying on the aforementioned provision that they claim is misleading. Thus, there could have been no detrimental reliance. Further, even assuming arguendo that some Retirees had read that provision, any reliance would have been unreasonable as the SPD explicitly states that AUSA reserved the right to change or terminate the Plan, as well as medical credits, at any time. As this Court has previously stated, "the SPD must be read as a whole. It would be

---

[10] Accordingly, there is no need to consider whether they are likely to meet the third element: extraordinary circumstances.

error to attend only to one paragraph, page, or portion of the summary." McCall v. Burlington Northern/Santa Fe Co., 237 F.3d 506, 512 (5th Cir. 2000).

Similarly, the Salaried Retirees' argument that the use of terms such as "annuity" and "works like a savings plan" misled them into thinking the medical credit was a vested benefit is unavailing. Once again, not only does the SPD explicitly state that the Plan does not create a vested right, but as noted in McCall, it would be unreasonable for a person who sees the word "annuity" or the phrase "works like a savings account" to conclude that the Plan created a vested right when those words are read in the context of the entire SPD. As AUSA observed in its brief, "the Salaried Retirees' argument relies on isolated terms taken out of context and having nothing to do with the clear reservation of rights clauses." We agree.

3. <u>Salaried Retirees' ERISA § 502(a)(2) claim</u>

ERISA § 502(a)(2) states that: "A civil action may be brought by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 409 [29 U.S.C. § 1109]." 29 U.S.C. § 1132(a)(2). Section 409 states, in relevant part:

> § 1109. Liability for breach of fiduciary duty
>
> (a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a). In Massachusetts Mutual Life Insurance Company v. Russell, the Supreme Court explained that under the remedial scheme laid out in ERISA, the remedies available under § 409 must inure to the benefit of the plan as a whole. 473 U.S. 134, 140 (1985). The Court explained: "A fair

contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary." Id. at 142. Based on Russell, many courts have held that claims for breach of fiduciary duty under § 502(a)(2) must be brought in a representative capacity on behalf of the plan as a whole, with the goal of protecting the financial integrity of the plan. See, e.g., LaRue v. DeWolff, Boberg & Assocs., 128 S. Ct. 1020, 1023 (2008) (explaining that the court of appeals rejected the petitioner's claim under § 502(a)(2) because the remedy he sought was "personal" and only related to his own plan benefits). However, in its recent decision in LaRue, the Supreme Court narrowed the holding of Russell and held that § 502(a)(2) "does authorize recovery for fiduciary breaches that impair the value of plan asserts in a participants' individual account." Id. at 1026.[11]

The Salaried Retirees contend that substantial evidence has been presented that AUSA breached its fiduciary duty by: misrepresenting its right to reduce or eliminate benefits under Plan B, misrepresenting its intention to lock-in the retirement benefits for those employees who retired early, and disposing of the medical savings accounts. Therefore, the Retirees argue that this Court should hold that they have shown a substantial likelihood of success on the merits. However, we agree with AUSA that the Salaried Retirees' § 502(a)(2) claim is unlikely to succeed because the Retirees have offered no evidence that Plan B sustained losses; indeed, it would be impossible for them to do so since, as explained above, Plan B is an unfunded Plan.[12] Accordingly,

---

[11] Specifically, the Court explained: "The 'entire plan' language in Russell speaks to the impact of § 409 on plans that pay defined benefits. . . . Consequently, our references to the 'entire plan' in Russell, which accurately reflect the operation of § 409 in the defined benefit context, are besides the point in the defined contribution context." 128 S. Ct. at 1025.

[12] AUSA also argues, relying on the district court's ruling, that the Salaried Retirees' § 502(a)(2) claim is unlikely to succeed on the merits because the Retirees are seeking

we hold that the district court did not abuse its discretion in concluding that the Salaried Retirees failed to show a substantial likelihood of success on their ERISA § 502(a)(2) claim.

4. Union Retirees' claim that their Retirement Medical Benefits Vested

First, the Union Retirees assert that the district court erred by concluding that their claim that the CBAs and the Termination Agreement vested Plan F medical insurance benefits was unlikely to succeed on its merits. They argue that the CBAs were ambiguous, and accordingly the district court should have considered the extrinsic evidence which establishes that AUSA previously specified that the medical benefits were fixed for the lifetime of the retirees. Specifically, they also point to the letter agreement that states that the premiums were fixed at $22 and $47.93. Second, the Union Retirees argue that the district court erred by denying their request for an accounting of the costs related to Plan E as well as for an injunction prohibiting the arbitrary and unsubstantiated increase of Plan E until an acceptable accounting is provided. The Union Retirees contend this is essential in order to prevent AUSA from terminating the benefits under Plan E.

"[U]nder ERISA, welfare benefits, such as health care insurance, are vested only if so provided by contract." Int'l Ass'n of Machinists & Aero. Workers v. Masonite Corp., 122 F.3d 228, 231 (5th Cir. 1997) (citing 29 U.S.C. § 1051(1)). The Masonite panel, relying on Supreme Court precedent, explained:

> Contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement. Exceptions are determined by contract interpretation. Rights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement.

"individualized reliance damages" and are not seeking relief on behalf of the Plan. But this is precisely the type of argument that was rejected by the Supreme Court in LaRue, which was decided after briefing was completed in this case.

Id. at 231-32 (citing Litton Financial Printing v. NLRB, 501 U.S. 190, 207 (1991)). Accordingly, whether a CBA vests insurance benefits in retirees is a question of contractual interpretation. Masonite, 122 F.3d at 231. While the interpretation of CBAs is governed by federal law, courts "may draw upon state rules of contractual interpretation to the extent that those rules are consistent with federal labor policies." Id. (internal quotation marks and citation omitted). If a CBA is found to be ambiguous, extrinsic evidence may be introduced to determine the parties' intent. United Paperworkers Int'l Union v. Champion Int'l Corp., 908 F.2d 1252, 1256 (5th Cir. 1990). "A contract is ambiguous if it is reasonably susceptible to more than one interpretation." Id. at 1255 (internal citations omitted).

Having reviewed the record, we find that the Retirees have offered no evidence that the CBAs, the Termination Agreement, or the language in Plan F's SPD itself expressly states that the medical benefits are vested in the retirees. Rather, as the district court noted, each CBA states that the hospitalization and insurance provisions under which the retiree medical benefits are included "shall be effective" only "during the term of this agreement." It is undisputed that all the CBAs have expired. Further, the Termination Agreement stated that AUSA had satisfied all its obligations to its bargaining unit members. Therefore, despite the Union Retirees' arguments to the contrary, the CBAs were not ambiguous; the retiree health benefits did not vest but were limited to the terms of the agreements. Moreover, Plan F's SPD contains a clause that reserves AUSA's right to terminate or change the plan. Accordingly, not only do the Union Retirees not have any vested rights to benefits, but they do not have a right to benefits at any fixed cost either. As the Eighth Circuit has written: "the mere fact that employee welfare benefits continue in retirement does not indicate that the benefits become vested for life at the moment of retirement."

Howe v. Varity Corp., 896 F.2d 1107, 1110 (8th Cir. 1990), aff'd, 516 U.S. 489 (1996).

Since the relevant language in the CBAs is not ambiguous, there is no need to resort to extrinsic evidence. However, even if the Union Retirees' extrinsic evidence were considered, the outcome would remain the same. The Retirees point to a purported letter that fixed the monthly premiums for Plan F retirees at $22 and $47.93. However, not only was that letter agreement never incorporated into any of the CBAs or the Termination Agreement, but no one who testified at the hearing has even seen this purported side agreement. Accordingly, there is no admissible evidence that validates the existence of this side agreement.

The Retirees' reliance on Cole v. ArvinMeritor, Inc., 516 F.Supp. 2d 850 (E.D. Mich. 2005), is misplaced. The language in the CBAs in that case is markedly different from the language in the CBAs at issue here, and more importantly, Cole relies on the inference that retiree benefits vest unless there is language in the CBA to the contrary. Id. at 865-67. This inference, known as the Yard-Man inference (from the case International Union v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1983)) has never been accepted by this court. Spacek v. Maritime Ass'n, 134 F.3d 283, 293 (5th Cir. 1998), abrogated on other grounds by, Central Laborers' Pension Fund v. Heinz, 541 U.S. 739, 743 (2004) ("Courts may not lightly infer an intent on the part of a plan to voluntarily undertake an obligation to provided vested, unalterable benefits." (internal quotation marks and citation omitted)); United Paperworkers, 908 F.2d at 1261 n.12 ("To the extent that Yard-Man held that there is, as a general proposition, an inference of an intent to vest retirement benefits . . . [we] find no basis in logic or federal labor policy for such a broad inference.").

Moreover, we find that the district court did not abuse its discretion in concluding that the Retirees were unlikely to succeed on their Plan E claim.[13] As noted above, the Retirees have not even alleged any contractual or statutory violation as to Plan E; they merely are requesting an accounting. We agree with AUSA that the Retirees are simply trying "to lump their discovery request into their pursuit of injunctive relief."

For the foregoing reasons, we hold that the district court did not abuse its discretion in determining that the Union Retirees were not likely to succeed on the merits of their Plan F or E claims.

B. Substantial Threat that Plaintiffs Will Suffer Irreparable Harm

Even assuming arguendo that the Retirees have demonstrated a substantial likelihood of success on the merits on some and/or all of their claims, we nevertheless still conclude that the district court did not abuse its discretion in denying the motion for preliminary injunction because the Retirees have failed to demonstrate that they face a substantial threat of irreparable harm. The Retirees' arguments that they and their spouses will face irreparable injury if the preliminary injunction is not issued is belied by the district court's extensive findings of fact. The district court carefully reviewed the testimony of every retiree who testified, and determined that no one was currently uninsured or unable to pay for coverage. The district court also highlighted that no evidence was offered that suggests these retirees could not continue their current coverage until a judgment is rendered in this lawsuit. The Retirees have not credibly challenged these determinations on appeal, and accordingly we hold that they have failed to carry their burden in demonstrating they will suffer irreparable harm if the preliminary injunction is not granted.

---

[13] Specifically, the district court concluded that "Plaintiffs' request for an 'accounting' is insufficient to warrant a preliminary injunction against increases. Plaintiffs have not shown a substantial likelihood of success on claims by Plan E Union Retirees."

C. Whether the Threatened Injury Outweighs any Damage the Injunction might cause the Defendant

Moreover, we hold that the district court properly determined that the threatened injury to the Retirees would not outweigh any damage the injunction might cause AUSA. AUSA has stated that it would face significant administrative hurdles and considerable costs if the injunction were issued and the company was required to reverse all the changes that have been implemented since 2003. However, the Retirees have only offered to post a "modest bond." Not only would such a bond violate the Federal Rules of Civil Procedure, but it would also be insufficient to compensate AUSA for any damages it has suffered if AUSA ultimately prevails in this case, the likely outcome given the above discussion regarding the Retirees' likelihood of success on the merits of their claims.

> Federal Rule of Civil Procedure 65(c) states:
>
> Security. The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

We have previously highlighted the importance of the bond requirement. "It assures the enjoined party that it may readily collect damages . . . in the event that it was wrongfully enjoined, without further litigation and without regard to the possible insolvency of the applicant, and it provides the plaintiff with notice of the maximum extent of its potential liability . . . . Because of the importance of the bond requirement, failure to require the posting of a bond or other security constitutes grounds for reversal of an injunction." Phillips v. Chas. Schreiner Bank, 894 F.2d 127, 131 (5th Cir. 1990) (internal quotation marks and citations omitted). Since the Retirees appear unable to meet the bond requirement of Rule 65(c), we hold that the damage the preliminary

injunction might cause AUSA greatly outweighs any threatened injury to the Retirees.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.