**COURT OF APPEALS
DECISION
DATED AND FILED**

**July 25, 2019**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2017AP2369**

**STATE OF WISCONSIN**

Cir. Ct. No. 2014CV3328

**IN COURT OF APPEALS
DISTRICT IV**

JEFFREY A. RIGGERT,

    PLAINTIFF-RESPONDENT-CROSS-APPELLANT,

V.

JOHN H. REED,

    DEFENDANT-APPELLANT-CROSS-RESPONDENT.

        APPEAL and CROSS-APPEAL from a judgment of the circuit court for Dane County: PETER C. ANDERSON, Judge. *Affirmed*.

        Before Lundsten, P.J., Kloppenburg and Fitzpatrick, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   This case returns to us following remand and arises from claims brought by Jeffrey Riggert under the Employee Retirement Income Security Act (ERISA) against John Reed.   The dispute stems from Riggert's employment at Innovologie, LLC, a company solely owned and managed by Reed. Prior to our first opinion in this case, the circuit court allowed Riggert to amend his first amended complaint to include a claim for denial of benefits under ERISA, granted summary judgment in favor of Riggert on the denial of benefits claim, and determined that Reed was individually liable for $84,494.83 in damages as well as $57,626.11 in attorney fees and expenses.   Reed appealed, challenging the court's decision to allow the amendment and the court's grant of summary judgment against him on the denial of benefits claim.   Riggert cross-appealed, arguing that the court erred by selecting an incorrect method of calculating damages and by failing to award Riggert the full amount of his request for attorney fees.

¶2     In our first opinion, we addressed only the first issue raised by Reed, which was whether the circuit court erred by allowing Riggert to amend the first amended complaint to include a claim for denial of benefits.   *Riggert v. Reed (Riggert I)*, No. 2017AP2369, unpublished slip op., ¶3 (Ct. App. Nov. 8, 2018). We concluded that the court applied the incorrect legal standard, and we remanded for the court to exercise its discretion under the standard that applies to motions to amend that are filed after summary judgment has been granted.   *Id.*   That standard is set out in *Mach v. Allison*, 2003 WI App 11, 259 Wis. 2d 686, 656 N.W.2d 766 (2002).   We did not, at that time, reach the other issues raised by the parties, but we retained jurisdiction over the appeal and cross-appeal.   *Riggert I*, No. 2017AP2369, ¶3.

¶3     On remand, the circuit court ruled that the amendment was properly permitted under the *Mach* standard.   The parties have now filed supplemental

2

appellate briefs addressing whether the court's amendment ruling was correct. In this opinion we address the following issues raised by Reed's appeal and Riggert's cross-appeal: (1) whether the circuit court on remand erred by permitting Riggert to amend the first amended complaint to include a claim for denial of benefits; (2) whether the court erred by granting summary judgment against Reed on the denial of benefits claim; (3) whether the court selected an incorrect method of calculating damages; and (4) whether the court erred by failing to award Riggert the full amount of his request for attorney fees.[1]

¶4       As we explain in the sections that follow, we conclude that the circuit court did not err as to any of these issues. Accordingly, we affirm.

## BACKGROUND

¶5       We set out the following undisputed facts in ***Riggert I***:

> Reed organized Innovologie, LLC in 2003. During the times pertinent to this lawsuit, Reed was the sole member and manager of Innovologie, he controlled all of the company's finances, and he made all of its management decisions.
>
> Innovologie offered its employees an IRA retirement plan, referred to as the Innovologie Plan, which permitted an employee to request that Innovologie withhold a defined amount from the employee's paycheck to deposit into the employee's retirement account. The Innovologie Plan also provided that Innovologie would contribute an additional 3% of an employee's compensation to the retirement account.
>
> Riggert worked for Innovologie between 2003 and December 2013 and participated in the Innovologie Plan during that time. Beginning around 2009, Innovologie

---

[1] The first issue was decided on remand by the Honorable Valerie Bailey-Rihn. The second, third, and fourth issues were decided before remand by the Honorable Peter Anderson.

continued to deduct contributions from Riggert's paychecks, but ceased depositing the employee and employer contributions in Riggert's retirement account.

No. 2017AP2369, ¶¶5-7.

¶6      Riggert sued Reed in December 2014, seeking to recover the value of the employee and employer deposits that had not been paid after December 2008. Riggert amended his complaint in August 2015. As relevant here, the amended complaint included a claim for breach of fiduciary duty under ERISA. In what we will refer to as the first summary judgment ruling, the circuit court granted summary judgment in favor of Riggert on the breach of fiduciary duty claim and, looking to the three-year statute of limitations that applies to a breach of fiduciary duty claim, *see* 29 U.S.C. § 1113(2) (2012),[2] calculated Riggert's damages based on the amounts of the contributions that were not deposited after November 2011.

¶7      Following the first summary judgment ruling, Riggert requested permission to amend his first amended complaint to include a claim for denial of benefits under ERISA, which, he asserted, is governed by a six-year statute of limitations. The circuit court permitted Riggert to amend the first amended complaint and agreed to "reconsider the calculation of damages."

¶8      Both parties moved for summary judgment on the second amended complaint. In what we will refer to as the second summary judgment ruling, the circuit court entered summary judgment against Reed on the denial of benefits claim and applied a six-year statute of limitations to Riggert's recovery under that

---

[2] All references to the United States Code are to the 2012 version unless otherwise noted.

claim. The court also dismissed the breach of fiduciary duty claim for lack of subject matter jurisdiction.[3] The court awarded Riggert $84,494.83 in damages on the denial of benefits claim and $57,626.11 in fees and costs, for a total judgment of $142,120.94.

¶9 Reed appealed, and Riggert cross-appealed. In **Riggert I**, we concluded that the circuit court had not applied the correct legal standard to Riggert's request to amend the first amended complaint. No. 2017AP2369, ¶3. We remanded for the court to apply the standard set out in **Mach**, which governs motions to amend a complaint filed after summary judgment has been granted. **Id.** On remand, after receiving argument from the parties, the court ruled that the amendment to include the denial of benefits claim was properly permitted under the **Mach** standard.

¶10 We now address Reed's challenge to that ruling, along with the other issues pending in Reed's appeal and Riggert's cross-appeal.

## DISCUSSION

¶11 We first address Reed's argument regarding the amendment to Riggert's first amended complaint and then take up the remaining issues from the appeal and cross-appeal.

---

[3] As we explained in our first opinion, the lack of subject matter jurisdiction defense was available to be raised by Reed from the time Riggert filed the first amended complaint, when the breach of fiduciary duty claim was first raised. *See* 29 U.S.C. § 1132(e)(1) (providing that federal district courts generally have exclusive jurisdiction of all actions arising under 29 U.S.C. § 1132, which includes actions raising claims for breach of fiduciary duty, and that federal district courts and state courts have concurrent jurisdiction of actions raising denial of benefits claims under 29 U.S.C. § 1132(a)(1)(B)). The parties do not explain why the lack of subject matter jurisdiction issue was not brought to the circuit court's attention until the proceedings on the summary judgment motions on the second amended complaint.

## I. Amending the First Amended Complaint

¶12    Reed argues that the circuit court on remand erred in its discretionary determination that the amendment of the first amended complaint to include a claim for denial of benefits was properly permitted.    We reject this argument because Reed has not shown that the court erroneously exercised its discretion.

¶13    "The decision whether to grant a motion to amend a complaint lies within the [circuit] court's discretion.    We affirm a [circuit] court's exercise of discretion if the court applied the correct legal standard to the facts of record in a reasonable manner."  *Mach*, 259 Wis. 2d 686, ¶20 (citations omitted).    The party asserting an erroneous exercise of discretion has the burden to establish that assertion.  *Colby v. Colby*, 102 Wis. 2d 198, 207-08, 306 N.W.2d 57 (1981).

¶14    Relying on *Mach*, we explained in *Riggert I* the standard governing a circuit court's adjudication of a motion to amend a complaint after summary judgment has been granted:

> A party may amend its pleading once as a matter of course within six months of the filing of the summons and complaint.  WIS. STAT. § 802.09(1).  After that period, a party may amend the pleadings only by leave of the court or by written consent of the adverse party.  *Id.*  While leave to amend should be freely given when justice so requires, *id.*, a higher standard is required when a party seeks leave to amend after summary judgment has been granted:
>
> > [W]hen a motion to amend a complaint is filed after a motion for summary judgment has been granted, there is no presumption in favor of allowing the amendment.  Rather, the party seeking leave to amend must present a reason for granting the motion that is sufficient, when considered by the [circuit] court in the sound exercise of its discretion, to overcome the value of the finality of judgment. The reasons why the party has not acted sooner, the

6

> length of time since the filing of the original complaint, the number and nature of prior amendments, and the nature of the proposed amendment are all relevant considerations, as is the effect on the defendant. However, the absence of specific prejudice to the defendant is not a sufficient reason, in itself, for allowing amendment, because that does not give appropriate weight to the value of the finality of judgment.

*Riggert I*, 2017AP2369, ¶17 (quoting *Mach*, 259 Wis. 2d 686, ¶27).

¶15    We conclude that, on remand, the circuit court specifically considered the *Mach* factors and properly applied the *Mach* standard. As to the first factor, "[t]he reasons why the party [here, Riggert] has not acted sooner [to amend the first amended complaint]," *Mach*, 259 Wis. 2d 686, ¶27, the court noted that Reed failed to raise a statute of limitations defense to the breach of fiduciary duty claim until briefing on Riggert's first motion for summary judgment on that claim. The court observed that Riggert sought to amend the first amended complaint to add the denial of benefits claim "pretty quickly" after Reed brought up the statute of limitations issue. As we review the court's analysis, it considered this first factor to therefore favor allowing Riggert to amend the complaint.

¶16    As to the second factor, "the length of time since the filing of the original complaint," *id.*, the circuit court stated that approximately twenty months elapsed between the original complaint and the court's decision to permit the second amendment. Thus, the court was cognizant of the time frame, but did not explicitly explain how this point factored into its analysis. There is, however, no reason to think that the court weighed this factor against permitting the amendment.

¶17    As to the third factor, "the number and nature of prior amendments," *id.*, the circuit court observed that there was only one prior amendment. The court

also noted that the one prior amendment had been necessary because the state law civil theft claim that was pleaded in the original complaint was preempted by ERISA, and that the second amendment was necessary because of the belated raising of the statute of limitations and jurisdictional defenses to the breach of fiduciary duty claim. The court suggested that those developments in the litigation were likely due to ERISA being "a very technical area." We construe the court's consideration of this element as favoring Riggert's request to amend.

¶18    As to the "effect on the defendant," *id.*, the circuit court reasoned that Reed was not prejudiced by permitting the amendment of the first amended complaint to include a denial of benefits claim because the same facts underlay both that claim and the claims that were alleged in the original and first amended complaints. The court stated that the denial of benefits and breach of fiduciary duty claims "are very similar under ERISA" and that "[t]hey all arise out of the same facts that everyone knew about." The court balanced this factor in favor of allowing the amendment.

¶19    The circuit court also weighed the "limited prejudice" to Reed if amendment were permitted against what it found to be the "great" prejudice to Riggert if amendment were not permitted, "because this is money earned and put away that the plaintiff would not be able to recover."

¶20    Based on its consideration of these factors, the circuit court determined that it "is appropriate to allow the amendment."

¶21    From this record, we conclude that the circuit court "applied the correct legal standard to the facts of record in a reasonable manner," and so acted within its discretion because it balanced the applicable facts and factors and

reached a decision a reasonable judge could make in these circumstances. *Id.*, ¶20. We reject Reed's three arguments to the contrary as follows.

¶22     First, Reed argues that Riggert "failed to present a reason" to permit the amendment and, therefore, "failed to fulfill his obligation as a plaintiff seeking the unusual remedy of being granted leave to amend a complaint after summary judgment." *See id.*, ¶27 ("the party seeking leave to amend must present a reason for granting the motion that is sufficient, when considered by the [circuit] court in the sound exercise of its discretion, to overcome the value of the finality of judgment").     In particular, he argues that on remand, Riggert merely and improperly advised the circuit court that the court's first ruling "had already satisfied the standard and all that was required was to mention the *Mach* factors 'on the record'"; therefore, Reed's argument goes, by failing to show why the *Mach* factors favored amendment, Riggert did not offer a sufficient reason to permit the amendment.

¶23     The record refutes this argument.  On remand, Riggert properly advised the circuit court that, "the Court of Appeals has now ordered that the Court must explicitly, by mention on the record, consider the individual, 'nonexclusive' factors described in *Mach*."  Then, Riggert proceeded to explain in detail, in the form of a proposed order, how each *Mach* factor, along with the additional relevant factor of serving "the ends of justice," favored Riggert.  Thus,

Riggert did "fulfill his obligation" on remand to present reasons for the court to permit amendment.[4]

¶24 Reed's second argument is that the circuit court erroneously exercised its discretion in permitting the amendment because it considered factors beyond those listed in *Mach* when making its determination. Specifically, Reed argues that the court improperly considered the "prejudice to Riggert," and that as a result, the court "applied the incorrect legal standard." We are not persuaded. As stated above, the court weighed what it found to be the limited prejudice to Reed against what it found to be the great prejudice to Riggert, and it explained the basis for those findings. *Mach* does not constrain a circuit court to consider only the specific factors identified in *Mach*; rather, *Mach* states that those factors are "relevant considerations" without prohibiting a court from considering additional factors. *Id.* Indeed, in *Riggert I*, we described the *Mach* factors as "nonexclusive" and instructed that, on remand, the court "should consider all of the *Mach* factors *and any other factors the court deems relevant*." No. 2017AP2369, ¶19 (emphasis added). Here, the court deemed prejudice to Riggert to be relevant because he would be unable to recover on the denial of benefits claim if the amendment were not permitted, given the development of the litigation to date. Reed fails to show that it was erroneous for the court to consider

---

[4] Reed also appears to argue that the amendment was improper because Riggert failed to present a sufficient reason based on the *Mach* factors in arguing for amendment the first time around. However, Reed does not develop an argument, supported by legal authority, that any asserted deficiency in Riggert's request for permission to amend should be a cause for reversal where, as here, the circuit court considered Riggert's request in light of the *Mach* factors and determined that there was sufficient reason such that the amendment was properly permitted. Accordingly, we do not consider the argument further.

prejudice to Riggert as a relevant factor in addition to the factors specified in *Mach*, given the background of this specific litigation.[5]

¶25    Third, Reed argues that the circuit court erroneously exercised its discretion because it "erred in assigning significance to the timing of Reed's statute of limitations defense" and "erred in concluding that the prejudice to Reed would be very limited." However, this argument overlooks our standard of review of the court's exercise of its discretion.

¶26    As to the significance of the timing of the statute of limitations defense, the court reasoned that Reed's failure to raise the defense until the proceedings on the first summary judgment motion partially explained why Riggert had not sought to bring a denial of benefits claim earlier. Reed argues that Riggert also shared responsibility for his delay in bringing that claim. However, Reed fails to make a viable argument that the court's weighing of each party's respective responsibility for the delay constitutes a basis for upsetting the circuit court's exercise of its discretion.

¶27    As to the prejudice to Reed, the circuit court reasoned that little prejudice existed because the denial of benefits claim was similar to the breach of fiduciary duty claim, and both claims arose from the same set of facts. Reed argues that the court erred in finding that the two ERISA claims arose out of the same operative facts because the denial of benefits claim implicated different legal

_____

[5] Reed contends that "[a] plaintiff would not seek to amend [the] complaint after receiving summary judgment in its favor unless it saw some benefit in doing so," and that, if circuit courts were permitted to consider prejudice to the party seeking amendment, then "every plaintiff [would] receiv[e] relief under *Mach*." We reject this argument because these fears are speculative and untethered to the case-specific analysis called for in *Mach* and exercised by the circuit court here.

issues, specifically related to Reed's individual liability, which required additional discovery and briefing in order to develop additional facts pertinent to those issues. However, the relatively minor difference in discovery does not negate the circuit court's reasoning. Our role on appeal is not to reweigh the factors, but only to review whether the court "examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion." *See Martindale v. Ripp*, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698. Because the court did so here, we conclude that Reed has failed to show that the court erroneously exercised its discretion.

¶28　We now turn to Riggert's claim for denial of benefits and the circuit court's summary judgment ruling on that claim.

## II. Denial of Benefits Claim

¶29　Reed argues that the circuit court improperly granted summary judgment against him on Riggert's denial of benefits claim. Reed does not contest that undisputed evidence supports the conclusion that all of the elements of a denial of benefits claim are satisfied. That is, Reed does not argue that Riggert's denial of benefits claim would not be valid against "the proper defendant," but instead argues that the "proper defendant" in this case is the Innovologie Plan, not Reed. As we explain, we conclude that the court properly granted summary judgment against Reed.

¶30　We review the circuit court's grant of summary judgment de novo, applying the same methodology as the circuit court. *Ewer v. Lake Arrowhead Ass'n*, 2012 WI App 64, ¶12, 342 Wis. 2d 194, 817 N.W.2d 465. Summary judgment is appropriate if "there is no genuine issue as to any material fact and …

12

the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2) (2017-18).[6]

¶31     In a denial of benefits claim, "[a]n employee benefit plan may sue or be sued … as an entity." 29 U.S.C. § 1132(d)(1). Here, the Innovologie Plan is established in a document entitled "Plan Agreement," and neither party appears to dispute that the Innovologie Plan is therefore an "employee benefit plan" as that term is defined for purposes of ERISA. *See, e.g., Larson v. United Healthcare Ins.*, 723 F.3d 905, 911-12 (7th Cir. 2013) (describing elements of an ERISA "plan"). Reed contends that the Innovologie Plan is therefore the only proper defendant as to Riggert's denial of benefits claim. In support of this argument, he cites multiple cases from the seventh circuit court of appeals, which he asserts support the proposition that only a plan can be sued for denial of benefits. *See, e.g., Leister v. Dovetail, Inc.*, 546 F.3d 875, 879 (7th Cir. 2008) ("The benefits are an obligation of the plan, so the plan is the logical and normally the only proper defendant.").

¶32     Riggert, in contrast, argues that he is entitled to recover against Reed rather than the Innovologie Plan because the Innovologie Plan is not a "distinct Plan entity." In support of this argument, Riggert cites *Leister*, in which the seventh circuit held that the owners of a company that had failed to deposit an employee's retirement contributions were individually liable for the employee's denial of benefits claim. 546 F.3d at 877-79. As we explain, we agree with Riggert that *Leister* is persuasive that Reed can be held individually liable for the

---

[6] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

denial of benefits claim here. We first review the facts and holding in *Leister*, next apply the *Leister* holding to the undisputed facts in this case, and conclude that under *Leister* Reed may be held individually liable for Riggert's denial of benefits claim. We then address and reject Reed's arguments to the contrary.[7]

¶33    In *Leister*, Michelle and Evan Peterson organized a corporation called Dovetail, Inc., of which the Petersons were the sole owners and officers. 546 F.3d at 877. They hired the plaintiff Leister, and Dovetail agreed "to deposit a specified portion of her salary in a 401(k) retirement account and to match a specified portion of these elective deferrals of compensation with its own contributions." *Id.* Dovetail arranged for "a bank [to] handle[ ] various financial details of the plan." *Id.* at 879. Dovetail and the Petersons stopped complying with the agreement after one year. *Id.* at 877-78. Leister filed a denial of benefits claim under ERISA against Dovetail and the Petersons, alleging that they had failed to deposit both her salary contributions and the employer's matching contributions into her retirement account. *Id.* at 877-79.

¶34    In determining whether the Petersons and Dovetail could be held liable, the *Leister* court first set out a general principle that, as to a denial of benefits claim, "[t]he benefits are an obligation of the plan, so the plan is the logical and normally the only proper defendant." *Id.* at 879. However, the court went on to state that "in cases such as this, in which the plan has never been unambiguously identified as a distinct entity, we have permitted the plaintiff to

---

[7] Riggert raises other theories as to why Reed should be individually liable for his denial of benefits claim. We do not address the other grounds argued by Riggert on appeal because we agree that Reed is individually liable based on *Leister v. Dovetail, Inc.*, 546 F.3d 875 (7th Cir. 2008). *See Turner v. Taylor*, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (if a decision on one issue disposes of an appeal, we will not generally decide the other issues raised).

name as defendant whatever entity or entities, individual or corporate, control the plan." *Id.* The court then concluded that, because Dovetail was "a small new company of conspicuous informality with no designated plan entity," judgment against the Petersons and Dovetail was appropriate. *Id.*

¶35 We understand *Leister* to hold that judgment against a non-plan defendant as to a denial of benefits claim is appropriate when two conditions are satisfied. First, the plan must "never [have] been unambiguously identified as a distinct entity." *Id.* Second, the non-plan defendant must be the entity that "control[s] the plan." *Id.* In *Leister*, both of these conditions were satisfied based on the fact that Dovetail was a "small new company of conspicuous informality," together with the Petersons' ownership and control over both Dovetail and Leister's retirement account. *Id.* Thus, when a plan, an employing company, and that company's principals are sufficiently intertwined—such that the plan is not distinct from the employer or principals and the principals exercised effective control over benefits promised pursuant to the plan—all become liable for a denial of benefits claim, and all are therefore proper defendants in a denial of benefits action. *Id.*; *see also Larson*, 723 F.3d at 913 ("the *obligor* is the proper defendant on an ERISA claim to recover plan benefits"); *Riordan v. Commonwealth Edison Co.*, 128 F.3d 549, 551 (7th Cir. 1997) (holding that judgment against an employer is appropriate when that employer is sufficiently intertwined with the plan); *see also Mein v. Carus Corp.*, 241 F.3d 581, 584-85 (7th Cir. 2001) (same).

¶36 Riggert argues that *Leister* is sufficiently analogous to justify holding Reed individually liable here. We agree. As to the first part of the *Leister* test, whether the plan was "never … unambiguously identified as a distinct entity," 540 F.3d at 879, Riggert presents a litany of undisputed facts showing that Innovologie is a small, informal company akin to the corporation in *Leister*, with a

15

similar informal relationship among the principals, the company, and the plan. Specifically, Riggert points to evidence that Innovologie is a small company that has only ever had four employees; that Reed is the sole principal and manager of Innovologie and has all rights to the company's income; that Reed and Innovologie frequently intermingled their physical and financial assets; that Reed and Innovologie failed to keep thorough records of Innovologie's finances; and that administration of the Innovologie Plan was haphazard, with few records and frequent missed deposits and payments. The record further establishes that the Innovologie Plan Agreement identified Innovologie as the employer, referred to Reed as the "Employer Contact," and designated Reed to serve as the trustee of the Innovologie Plan.

¶37 These undisputed facts suffice to show that the Innovologie Plan was not unambiguously a "distinct plan entity" from which Riggert could obtain the benefits owed to him. That is, the informality of the relationship among Reed, Innovologie, and the Innovologie Plan indicates that the Innovologie Plan is not a distinct entity from which independent recovery may be possible. *Cf. Riordan*, 128 F.3d at 551 (judgment against employer appropriate where "the exact relationship between [the employer] and the plan is not clearly set out").

¶38 As to the second part of the *Leister* test, whether the defendant "control[s] the plan," 546 F.3d at 879, the undisputed facts establish that Reed both controlled when and how much money would be deposited into employees' retirement accounts and informed employees when deposits would be delayed for lack of funds. These facts demonstrate that Reed controlled the plan sufficiently to render him an appropriate defendant under *Leister*. *Cf. Larson*, 723 F.3d at 913 (insurance company that "decide[d] contractual eligibility and benefits questions and pa[id] the claims" was appropriate defendant in denial of benefits claim).

16

¶39     We conclude that Riggert persuasively argues that Reed is similarly situated to the defendants held individually liable in *Leister*, and that Riggert has shown both that the Innovologie Plan was not unambiguously identified as a "distinct plan entity" and that Reed controlled the benefits held by the Innovologie Plan.  Accordingly, based on *Leister*, Reed is an appropriate defendant in this denial of benefits action.  We now address Reed's arguments to the contrary.

¶40     Reed argues that this case is factually distinct from *Leister* in four respects.  First, he argues that Innovologie is not, in the words of Leister, "a ... new company."  *Leister*, 546 F.3d at 879.  Reed notes that Innovologie was created in 2003 and thus is significantly older than the corporation in *Leister*.  However, Reed does not explain why this difference materially affects the analysis in *Leister*, or the central questions regarding the extent of Reed's control over the Innovologie Plan and the general unity of identity between Reed and Innovologie pertaining to the Innovologie Plan.  We conclude that the newness of a company is not an important consideration.

¶41     Second, Reed disputes that Innovologie was run with "conspicuous informality" as that phrase is used in *Leister*.  *See id.*  To that end, he cites "R.58" for his conclusory assertion that Innovologie "demonstrated the hallmarks of a normal business for over a decade."  While that twenty-seven-page document does describe some of Innovologie's actual business practices, some of which might be considered "normal," it also confirms several of Riggert's assertions regarding informal practices, such as Reed's frequent delays in depositing Riggert's IRA contributions.  Reed fails to explain how the practices described in the document show that Innovologie, and Reed's relationship with it as pertaining to the Innovologie Plan, are not "conspicuously informal."  That is, Reed fails to identify the particular facts—in that document or elsewhere—which show that Innovologie

17

differed materially from the corporation in *Leister* in terms of the informality of the relationship between Reed and Innovologie as it pertains to the Innovologie Plan. If there are facts in the record not brought to our attention that do support Reed's argument, we simply observe that it is not our duty to "sift" the record to extract facts favorable to Reed's argument. *Jensen v. McPherson*, 2004 WI App 145, ¶6 n.4, 275 Wis. 2d 604, 685 N.W.2d 603. In sum, Reed fails to point to facts showing that Innovologie was not the sort of small informally run company for which it makes sense to hold Reed personally liable under the reasoning in *Leister*.[8]

¶42 Reed's third factual basis for distinguishing *Leister* is that here, the Innovologie Plan was governed by the Innovologie Plan Agreement, which named Innovologie as the employer. Reed appears to assert that the existence of the Innovologie Plan Agreement means that, unlike in *Leister*, here there is a "designated plan entity." 546 F.3d at 879. However, the mere existence of a plan agreement does not distinguish this case from *Leister* because the corporation in *Leister* also signed a formal plan agreement. 546 F.3d at 879. Moreover, to argue that the existence of a plan agreement distinguishes this case from *Leister* misses the point entirely: *Leister* holds that a plan, although formally established in writing, may nevertheless not constitute a "distinct plan entity" if the relationship

---

[8] The above discussion concerning conspicuous informality is limited to the facts and arguments that are raised in the portion of Reed's briefing related to the applicability of *Leister* and supported by citations to the record. For the sake of completeness, we note that elsewhere in his briefing, Reed makes a variety of factual assertions pertaining to the informality of Innovologie; for instance, he asserts that the company was fully capitalized. However, none of these assertions are supported by accurate citations to the record, and we therefore do not consider them in support of Reed's argument that *Leister* should not apply. *See State v. McMorris*, 2007 WI App 231, ¶30, 306 Wis. 2d 79, 742 N.W.2d 322 (court of appeals may "choose not to consider ... arguments that lack proper citations to the record").

between the plan and another entity, such as an employer, is sufficiently informal. *Id.* Thus, an employer may be liable for a denial of benefits claim *despite* the presence of a plan, and the liability of the employer may be established by the "conspicuous informality" of the relationship between the plan and the employer. *Id.* As discussed above, Reed fails to establish a dispute of the material facts showing the informality of the relationship between Reed and Innovologie pertaining to the Innovologie Plan; therefore, the existence of the Innovologie Plan Agreement is wholly consistent with Reed's individual liability under the *Leister* analysis.

¶43    Reed's fourth factual basis for distinguishing *Leister* seems to be that here, Fidelity Management Trust Company, as custodian of the Innovologie Plan, was responsible for administering the Innovologie Plan in accordance with the Plan Agreement. Although not explicitly stated as such, we interpret this argument as a challenge to the conclusion that Reed controlled the benefits held by the Innovologie Plan, instead offering up Fidelity as the true controller of the Innovologie Plan. However, as the Innovologie Plan Agreement makes clear, the "Employer," not Fidelity, was the entity required to deposit contributions into the account. The Agreement also identifies "the Employer," not Fidelity, as the administrator of the Innovologie Plan, with "discretionary authority to determine all questions arising out of the administration, interpretation, and application of the Plan…." In fact, the Innovologie Plan Agreement imposes no duty on Fidelity whatsoever except to hold assets and keep records. Fidelity had no control of the benefits decision, and its role as custodian does not negate the conclusion that Reed and Innovologie were intertwined as pertaining to the Innovologie Plan to such an extent that all may be liable for benefits owed to Riggert.

¶44     In sum, we reject Reed's attempts to distinguish *Leister* on the facts. We now turn to Reed's two attacks on the vitality of *Leister* as relevant legal authority.

¶45     First, Reed challenges the legal authoritative value of *Leister* on the basis that its holding deviates from the plain language of 29 U.S.C. § 1132(d)(2), which, he asserts, instructs that judgment for denial of benefits may lie only against a plan or plan administrators in their official capacities.[9]   We are not persuaded.   As the court in *Leister* explains, 29 U.S.C. § 1132(d) contains two clauses:

> The first clause just allows plans to be sue or be sued, and the second clause just specifies consequences *if* the plan is sued; neither seems to be limiting the class of defendants who may be sued.  The benefits are an obligation of the plan, so the plan is the logical and normally the only proper defendant.  But in cases such as this, in which the plan has never been unambiguously identified as a distinct entity, we have permitted the plaintiff to name as defendant whatever entity or entities, individual or corporate, control the plan….

546 F.3d at 879.   Reed fails to explain why the court's conclusion is wrong. Therefore, we do not consider this argument further.   *See **State v. Pettit**,* 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (appellate courts may decline to consider undeveloped arguments).[10]

---

[9] The full text of 29 U.S.C. § 1132(d)(2) states, "Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter."

[10] We observe that the conclusion in *Leister* that 29 U.S.C. § 1132(d) does not necessarily prohibit plaintiffs from naming non-plans as defendants in a denial of benefits action is in accord with the prevailing view among the federal circuits.  *See, e.g., **Life Care Mgmt. Servs. v. Insurance Mgmt. Adm'rs**,* 703 F.3d 835, 843 (5th Cir. 2013) ("This court has found that
(continued)

¶46     Second, Reed asks us to reject *Leister* on the ground that it is persuasive authority only.  However, Reed fails to develop an argument why we should not follow it as persuasive authority, particularly in light of its factual similarity to this case.  *See Alberte v. Anew Health Care Servs.*, 2000 WI 7, ¶7, 232 Wis. 2d 587, 605 N.W.2d 515 ("we may of course seek guidance in the persuasive authority of other jurisdictions").

¶47     In sum, the undisputed facts presented by Riggert establish that Innovologie is a small company of conspicuous informality, and that Reed exercised effective control over Innovologie and over benefits decisions of the Innovologie Plan.  Under *Leister*, these facts show that the Innovologie Plan is not a "distinct plan entity" from which Riggert can recover, and that Reed is an appropriate defendant as to Riggert's denial of benefits claim.  Because Reed fails to show why *Leister* is not persuasive authority, we conclude that the circuit court properly ruled that Reed may be held individually liable for Riggert's denial of benefits claim under 29 U.S.C. § 1132(a)(1)(B).  Therefore, we affirm the entry of summary judgment against Reed on the denial of benefits claim.

---

a claimant may bring a suit against an employer when the plan has no meaningful existence apart from the employer, and when the employer made the decision to deny benefits."); *Cyr v. Reliance Standard Life Ins.*, 642 F.3d 1202, 1206 (9th Cir. 2011) (concluding that the language of 29 U.S.C. § 1132(d)(2) implies that "potential defendants in actions brought under § 1132(a)(1)(B) should not be limited to plans and plan administrators"); *Musmeci v. Schwegmann Giant Super Mkts., Inc.*, 332 F.3d 339, 349 (5th Cir. 2003) (observing that, "[w]hile the language [in 29 U.S.C. § 1132(d)(2)] suggests that the plan is the only proper party defendant, other Circuits have allowed employees to maintain actions against their employers for the denial of benefits" and proceeding to do the same); *Layes v. Mead Corp.*, 132 F.3d 1246, 1249-50 (8th Cir. 1998) (plan administrator can be held liable for denial of benefits); *Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir. 1988) (same); *but see Graden v. Conextant Sys. Inc.*, 496 F.3d 291, 301 (3d Cir. 2007) ("In a § 1132(a)(1)(B) claim, the defendant is the plan itself (or plan administrators in their official capacities only)."); *Crocco v. Xerox Corp.*, 137 F.3d 105, 107-08 (2d Cir. 1998) (precluding a finding that an employer may be liable as a de facto plan administrator in the presence of a different named administrator).

### III. Damages and Attorney Fees

¶48 Having concluded that Reed may be held individually liable for Riggert's denial of benefits claim under 29 U.S.C. § 1132(a)(1)(B), we now turn to Riggert's cross-appeal, in which he challenges the circuit court's calculation of his damages, as well as the court's award of attorney fees. We address each of these challenges in turn.

### A. Damages

¶49 The parties agree that Riggert's damages arising from Reed's denial of benefits include three components. The first and second components comprise the amount of Riggert's own contributions that were not deposited in his retirement account, and the amount of the employer's matching contributions that were not deposited in his retirement account. The circuit court calculated these first two components to total $53,811.00, and the parties do not dispute that calculation. The third damages component comprises Riggert's opportunity costs for lost use of the money that was not timely deposited into his account. The court in its second summary judgment ruling applied the actual average rate of return of the Innovologie Plan during the period in which the deposits were not made to Riggert's account and arrived at a figure of $30,683.83. In his cross-appeal, Riggert argues that the court applied the wrong rate of return in calculating the opportunity-cost damages. We review the court's summary judgment ruling de novo. *Ewer*, 342 Wis. 2d 194, ¶12.

¶50 Riggert argues that the circuit court should have applied the methodology outlined in 29 C.F.R. § 2510.3–102(d). That regulation generally provides that, where an employer has opted to delay depositing contributions to a retirement account beyond the acceptable period, the employer must pay interest

"to the plan," and the interest rate is the greater of two alternative values: the amount of interest the contributions would have earned had they been timely deposited in the "investment alternative" with the highest rate of return or a statutorily defined underpayment rate. 29 C.F.R. § 2510.3—102(d)(3). Reed asserts that application of this methodology would have yielded a higher rate of return and, consequently, a higher calculation of damages. In support of his argument that the regulation should apply here, Riggert points to the federal Department of Labor's investigation of this case, which occurred in the time between the filing of the original complaint and the filing of the first amended complaint, in which the Department applied the regulation to calculate Reed's liability "to the plan." Riggert also points to two unpublished federal district court opinions in which the courts applied that same regulation to calculate damages owed for failure to timely deposit contributions to the plan. *See **Wilson v. United Int'l Investigative Servs. 401(K) Sav. Plan***, No. Civ.A. 01–CV–6126, 2002 WL 32116850, at *3 (E.D. Pa. Oct. 28, 2002); ***McConnell v. Costigan***, No. 00 Civ. 4598(SAS), 2002 WL 313528, at *9 (S.D.N.Y. Feb. 28, 2002).

¶51     However, all of Riggert's authority is inapposite because it addresses claims for breach of fiduciary duty brought on behalf of a plan, not claims for denial of benefits brought on behalf of a plan participant. The two causes of action implicate different considerations concerning damages. In a breach of fiduciary duty claim, a defendant must "make good to [the] plan any losses to the plan" and "restore to [the] plan any profits … which have been made through use of assets of the plan…." 29 U.S.C. § 1109(a). Thus, claims for breach of fiduciary duty typically result in damages owed to *a plan*, not to an individual plan beneficiary. *See **Massachusetts Mut. Life Ins. v. Russell***, 473 U.S. 134, 140, 144 (1985) (accepting that "recovery for a violation of [29 U.S.C. § 1109] inures to the

23

benefit of the plan as a whole" and does not "authorize any relief except for the plan itself"). Accordingly, the Department of Labor regulation, which specifically applies to the calculation of "assets of the plan," 29 C.F.R. § 2510.3–102(a), is properly used to calculate damages owed to a plan in a breach of fiduciary duty context, which is explicitly the situation addressed in all of Riggert's purported authority. *See Wilson*, 2002 WL 32116850, at *3-4 ("under the regulatory language, payment is owed to the Plan rather than to the individual participants," and the complaint "ask[ed] for the fiduciary defendants to 'make good' any losses 'to the Plan' resulting from their breaches of fiduciary duty"); *McConnell*, 2002 WL 313528, at *6, 9.

¶52    In contrast, in a claim for denial of benefits brought on behalf of an individual plan participant, a plaintiff can only "recover benefits due to him [or her] *under the terms of his [or her] plan*." 29 U.S.C. § 1132(a)(1)(B) (emphasis added). As a general rule an individual plan participant is precluded from any relief beyond the "relief to which the plan documents themselves entitle the participant." *Harzewski v. Guidant Corp.*, 489 F.3d 799, 804 (7th Cir. 2007); *see also Massachusetts Mut.*, 473 U.S. at 144 ("[29 U.S.C. § 1132(a)(1)(B)] says nothing about the recovery of extracontractual damages"). Thus, in a defined-contribution plan (as here), the "benefit" to which an individual participant is entitled is "what he [or she] would have received had the formula [for making contributions] been honored," not the amounts necessary to restore the plan funds to where they would have been in the absence of a breach. *Harzewski*, 489 F.3d at 805. Indeed, this dichotomy between damages recoverable by a plan for breach of fiduciary duty and damages recoverable by an individual plan participant for denial of benefits is expressly noted in Riggert's own authority. *See Wilson*, 2002 WL 32116850, at *3 ("[c]ongress intended plan and not individual plan

beneficiary to recover extracontractual damages" (citing *Hein v. FDIC*, 88 F.3d 210, 222-23 (3d Cir. 1996))). While the courts in *Wilson* and *McConnell*, as well as the Department of Labor in this case, could all properly apply the Department's regulation in order to calculate the damages owed to the plan by the fiduciary, neither the court rulings nor the Department's investigation address the calculation of benefits owed to an individual plan participant under this separate line of analysis.[11]

¶53    In sum, Riggert fails to support with relevant legal authority his argument that he is entitled to damages based on the methodology outlined in 29 C.F.R. § 2510.3–102(d).

¶54    Although we have concluded that Riggert's authority does not support his proposed methodology for calculating damages, we must still determine the correct methodology. In this respect, Reed argues that *Leister* provides persuasive authority that supports awarding Riggert opportunity-cost damages calculated by using the methodology employed by the circuit court, namely, the average rate of return of the Innovologie Plan during the period in which the deposits were not made to Riggert's retirement account. Specifically, he points to the following language in *Leister*: "[T]he benefits to which Leister was entitled were the assets that would have been in her 401(k) account had the defendants" made the deposits in accordance with the terms of the retirement plan. 546 F.3d at 881. The court elaborated, "Those assets include not only the unpaid

---

[11] Because the Department of Labor did not apply its regulation to a calculation of Riggert's damages in a denial of benefits context, we reject his contention that we must defer to the Department's calculation under the principles of *Auer* deference. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).

contributions but also a reasonable estimate of how those contributions, had they been made, would have grown by being invested responsibly in accordance with the terms of the retirement plan." *Id.*

¶55    While acknowledging that Leister had waived the issue, the ***Leister*** court specifically rejected Leister's expert's valuation based on the performance of the best of the investment vehicles in which the contributions might have been placed because it "would yield a windfall," and concluded that a calculation based "on the average performance of the investment vehicles" was the proper method for calculating damages.  *Id.*  Instead of looking back at what the most profitable allocation would have been, the court concluded that "the return on the existing investment would have been the appropriate benchmark."  *Id.*  Reed argues that the circuit court's calculation using the actual average rate of return of the Innovologie Plan during the period in which the deposits were not made to Riggert's retirement account was proper because it is consistent with this language in ***Leister***.

¶56    We conclude that the damages approach set forth in ***Leister*** is reasonable and consistent with ERISA's instruction that a plan participant is entitled to receive only those benefits due "under the terms of his [or her] plan," and no more.  *See* 29 U.S.C. § 1132(a)(1)(B) (denial of benefits claimant can "recover benefits due to him [or her] *under the terms of his plan*" (emphasis added)); *see also **Massachusetts Mut.**,* 473 U.S. at 144 (denial of benefits claimant not entitled to relief beyond that found in the plan itself).

¶57    Riggert responds to Reed's ***Leister*** argument with a series of arguments that we briefly dispatch.  Riggert contends that the court's discussion in ***Leister*** provides no persuasive value because it is dictum and does not address the

Department of Labor methodology discussed above. However, Riggert does not explain why any particular discussion in authority such as *Leister* that is only persuasive to begin with is any less persuasive just because the discussion could be aptly characterized as dictum. To the extent Riggert argues that we should not be persuaded by *Leister* because it does not address the Department of Labor methodology, we have already explained that this line of attack by Riggert is flawed.

¶58    Riggert also suggests that the circuit court selected a method that resulted in a lower calculation of damages because Riggert would also be entitled to an award of attorney fees. This suggestion is belied by the legal analysis in which the court engaged in determining how to calculate Riggert's damages.

¶59    Finally, Riggert argues that calculating damages according to the plan's actual average rate of return runs counter to the legislative intent behind ERISA and practical policy. However, "vague notions of a statute's 'basic purpose' are [] inadequate to overcome the words of its text regarding the specific issue under consideration. This is especially true with legislation such as ERISA, an enormously complex and detailed statute that resolved innumerable disputes between powerful competing interests—not all in favor of potential plaintiffs." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261-62 (1993) (citations omitted).

¶60    In sum, we adopt the *Leister* approach as the appropriate method to calculate Riggert's damages here, and we, therefore, affirm the circuit court's damages award that calculated Riggert's opportunity-cost damages based on the average rate of return of the Innovologie Plan.

## B. Attorney Fees

¶61 Riggert also cross-appeals the circuit court's award of attorney fees. Riggert had requested a fee award of $104,341.69, comprising $103,040.80 in attorney fees and $1,300.89 in costs. The court extensively analyzed the relevant facts and determined that Riggert was entitled to recover his attorney fees because he had achieved some degree of success on the merits, but awarded only $57,626.11, comprising $56,000 in fees and $1,626.11 in costs, because much of the work by Riggert's attorneys "was not warranted, all things considered." We discern from Riggert's briefing that he challenges only the fee portion of the award.[12]

¶62 The parties agree that the decision to award fees in a denial of benefits action is discretionary. *See* 29 U.S.C. § 1132(g)(1); *Hardt v. Reliance Standard Life Ins.*, 560 U.S. 242, 255-56 (2010) (a court's decision regarding fees under 29 U.S.C. § 1132(g)(1) is largely discretionary, provided that the party to whom fees are awarded achieves "some degree of success on the merits"). As previously stated, "[w]e affirm a [circuit] court's exercise of discretion if the court applied the correct legal standard to the facts of record in a reasonable manner." *Mach*, 259 Wis. 2d 686, ¶20 (citations omitted).

¶63 Riggert makes four arguments in support of his challenge to the fee portion of the circuit court's award. First, Riggert argues that the court misapplied

---

[12] WISCONSIN STAT. § 814.045(1) provides that, under Wisconsin law, in determining the reasonableness of fees, the circuit court "shall" consider the lengthy list of factors stated in the statute. However, neither party seems to rely on that statute. Rather, the parties in their briefing cite to federal case law only. Accordingly, we follow their lead and assume, without deciding, that the federal law they cite applies here.

the standards set out in United States Supreme Court and seventh circuit court of appeals opinions, which were designed to be used to determine *whether* to award fees, to instead determine *how much* to award in fees. The record belies this argument, in that it establishes that the court used the standards precisely to determine whether to award fees over three pages of transcript and then spent the remaining ten pages of transcript reviewing what it considered to be the relevant facts and explaining how those facts warranted the amount of fees that it awarded.

¶64     Second, Riggert argues that the circuit court improperly analyzed he standards governing whether to award fees at all. However, Riggert suffered no harm from the court's analysis of the standards, because the court determined that Riggert was entitled to attorney fees based on that analysis and the court used a separate analysis to determine the amount of fees.

¶65     Third, Riggert argues that the circuit court failed to apply the "lodestar factors" to its analysis as he asserts is required by *Stark v. PPM America, Inc.*, 354 F.3d 666, 674 (7th Cir. 2004) (the "lodestar" is "the product of an attorney's reasonable hourly rate and the number of hours reasonably expended"). However, that federal opinion is not binding, and, in any event, the court did not question the lodestar factors, namely the hourly rates or the number of hours worked. Rather, consistent with, but apart from, the lodestar analysis, the court applied an across-the-board reduction based on its assessment of the reasonableness of the expenditure of time for the reasons it stated in its ruling. *See id.* (lodestar is reduced depending on the reasonableness of the expenditure of time).

¶66     Fourth, Riggert challenges the circuit court's views of the facts. Specifically, he argues that the court unreasonably apportioned blame to Riggert

for making the litigation more "protracted, costly and difficult" and that the court should have found that Reed was mostly to blame. However, the court acknowledged that both parties undertook work throughout the course of the litigation that "was not warranted." In essence, Riggert disagrees with how the court weighed the relevant facts in reaching its determination that an amount of $56,000 would be a "fair" award of fees in light of Riggert's success on various issues, Reed's success on various defenses, and the procedural complexity of the case. Riggert's disagreement is for naught where, as here, the court examined the relevant facts, applied proper standards of law, and, using a rational process, reached a conclusion that a reasonable judge could reach.

¶67    In sum, Riggert fails to show that the circuit court erroneously exercised its discretion in awarding fees and costs.

## CONCLUSION

¶68    For the reasons stated, we affirm.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)(5).